**DMS ALL–STAR JOINT VENTURE,**
Plaintiff,

v.

**The UNITED STATES, Defendant,**

**He and I Construction, Inc.,**
Intervenor-defendant.

No. 09–737 C.

United States Court of Federal Claims.

Jan. 26, 2010.[1]

---

**1.** This opinion was issued under seal on December 23, 2009. Pursuant to ¶ 4 of the ordering language, the parties were invited to identify source selection, proprietary or confidential material subject to deletion on the basis that the material was protected/privileged. Brackets ( [ ] ) identify the redacted portions of the opinion.

■■■■■■■■

John C. Dulske, San Antonio, TX, for plaintiff. Joan Kelley Fowler Gluys and Bryan Kost, San Antonio, TX, of counsel.

Scott T. Palmer, United States Department of Justice, with whom were Tony West, Assistant Attorney General, Jeanne E. Davidson, Director, Donald E. Kinner, Assistant Director, Washington, DC, for defendant. Charles D. Halverson, Captain, United States Army Legal Services Agency, Arlington, VA, of counsel.

Johnathan M. Bailey, San Antonio, TX, for intervenor-defendant.

## OPINION

BUSH, Judge.

DMS All–Star Joint Venture (DMS) filed its pre-award bid protest complaint in this court on October 28, 2009, challenging the Department of the Army's proposed award of a contract to intervenor He & I Construction, Inc. (He & I) under Solicitation No. W9124J–06–R–0031. Compl. ¶ 2. This bid protest is now before the court on the parties' cross motions for judgment on the administrative record. The administrative record (AR) was filed on November 4, 2009, and briefing followed according to an expedited schedule. Oral argument was held on December 2, 2009. For the reasons set forth below, defendant's motion for judgment on the administrative record is granted, and plaintiff's motion is denied.

## BACKGROUND

### I. Solicitation

On March 9, 2007, the Army issued Solicitation No. W9124J–06–R–0031 for a job order contract at Fort Sill, Oklahoma. AR Tab 4. The contract is an indefinite delivery, indefinite quantity (IDIQ) contract for maintenance, repair, and minor construction work on real property located on the base. AR at 235. The contract contemplates the procurement of services through individual task orders. *Id.* Under the contract, the contracting officer will issue task orders to the contractor in response to requests from the Directorate of Public Works, and the contractor will perform specific projects based on those task orders. *Id.* Defendant issued eight amendments and modifications to the original solicitation between March 30, 2007 and February 13, 2009. *See* AR Tabs 5–7, 43, 45, 47, 53, and 56.

The contract will cover an initial one-year base period plus four one-year option periods. AR at 220–24. The "maximum estimated" value of the contract is $20 million per year, for a total potential value of $100 million over the life of the contract.[2] *Id.* at 220. The solicitation contemplates a negotiated procurement process in which participation is limited to Small Business Administration (SBA) 8(a) business concerns located in Oklahoma or having a bona fide office within Oklahoma. AR at 218.

The solicitation required the submission of proposals in four separate parts: administrative, price, technical, and past and present performance. AR at 310. The controversy in this bid protest largely relates to the price proposal evaluations, and for this reason, the court will limit its analysis primarily to that part of the solicitation. In their price proposals, offerors were required to submit a firm fixed-price coefficient for each of several contract line item numbers (CLINs) for the base year and each option year.[3] AR at 311–12. Those coefficients would then be multiplied by unit prices provided in the most current edition of the R.S. Means Facilities Construction Cost Data Book (RSM) to derive prices for individual tasks performed under the contract. AR at 311. The solicitation provides that the price coefficients will take into ac-

---

**2.** The solicitation provided that the contract would have a minimum value of $500,000 for the base year and each option year. AR at 220.

**3.** The solicitation explains the term coefficient: "A coefficient, as defined in AFARS 5117.9001, is 'a numerical factor that represents costs (gener-

ally indirect costs) not considered to be included in RSM unit prices (e.g., general and administrative and other overhead costs, insurance costs, bonding and alternative payment protection costs, protective clothing, equipment rental, and also contractor's profit)." AR at 311.

count the indirect costs of the contractor, including, *inter alia*, overhead and profit for both the prime contractor and its subcontractors. AR at 312. These indirect costs are distinguishable from and in addition to the costs of labor, material and equipment, which are represented by the RSM unit prices.[4] AR at 312.

The solicitation provides that the government was to evaluate proposals based on three independent factors: technical/management approach (Factor 1), past and present performance (Factor 2), and price (Factor 3). AR at 318. The solicitation also describes the relative importance of the three factors in the evaluation of proposals:

> Technical/Management Approach (Factor 1) and Past and Present Performance (Factor 2) are equal in importance. Factor 1 and Factor 2, when combined, are significantly more important than Price (Factor 3). The Government desires proposals that offer the overall best value in meeting the requirements with acceptable risk at a fair and reasonable price. Price could become the determinative selection factor if the technical proposals and Past and Present Performance (Risk) evaluations are determined to be equal.

*Id.* The solicitation further provides that a "proposal that is unrealistic in terms of technical quality or price will be deemed reflective of an inherent lack of technical competence or indicative of failure to comprehend the complexity and risks of the contractual requirements ... and may be rejected as unacceptable without further evaluation or discussion." *Id.*

The solicitation section providing a description of the government's methodology for the evaluation of price proposals is reproduced here in its entirety:

> a. The **Price Factor Coefficients** will be evaluated using price analysis techniques. In selecting the best overall proposal, the Government will consider the value of each proposal in terms of the quality offered for the price. Each proposal will be evaluated for price reasonableness. For evaluation purposes, each offeror's coefficient proposed will be evaluated based on the following:
>
> 100% of the work will be performed on Fort Sill, Oklahoma.
>
> b. NOTICE: For the purpose of proposal evaluation only, offerors should base their proposals on a notional target cost of $20,000,000.00 for the base period. This figure is for proposal evaluation only and may not reflect the actual dollar amount of projects delivered during the contract period.
>
> c. FIRM FIXED PRICE: Offerors are advised that *only* offers submitted on a firm fixed price basis will be considered.
>
> The Financial Liaison Advisor (FLA) will evaluate each offeror's coefficients using price analysis techniques to determine fair and reasonable price.
>
> Price/Cost will be evaluated using price and/or cost analysis techniques. The price will be evaluated to determine cost reasonableness and completeness of the coefficient in terms of the government's requirement. The Government is interested in proposals that offer value in meeting the requirements, with an acceptable performance risk, at a fair and reasonable price. Price/Cost, however, could become the determining selection factor if technical proposals are determined to be substantially equal or if a technically superior proposal is deemed not to be worth the high cost premium.

AR at 318–19.

Thus, offerors were on notice that the evaluation of their price proposals would utilize price analysis techniques. Price reasonableness and cost reasonableness would be evaluated, as would the completeness of the offerors' coefficients. In addition, offerors were warned that unrealistic price proposals might be eliminated from the competition. There is no promise in the solicitation, however, that a

---

4. It is important to note that a contractor may expect to pay less than RSM amounts for labor, material and equipment required by the contract, and to structure its bid according to this expectation that its costs will be below RSM costs. This type of cost adjustment is referred to by the parties as the "book efficiency" or "book adjustment" factor, and is reflected in the formulas the offerors used to calculate their price coefficients. *See* AR at 2587–88.

particular type of "price realism" analysis would be conducted for each price proposal.[5] Indeed, no specific mention of a price realism analysis can be found in the original or amended versions of the acquisition plan, the source selection plan, or the solicitation. *See* AR at 7, 20 (Acquisition Plan) (containing no more than a brief mention of "price analysis techniques"); *id.* at 35, 38–39, 1051, 1054–55 (Source Selection Plan) (describing various aspects of the price and cost analysis, but not mentioning a "price realism" analysis); *id.* at 139–40, 318–19, 2112 (solicitation) (not mentioning the term "price realism" in the price proposal evaluation description).

Although the solicitation expresses the government's intent to evaluate proposals and award the contract without discussions, it nonetheless reserves to the Army the right to conduct discussions with offerors if these are deemed to be necessary by the contracting officer. AR at 318. To this end,

> the Contracting Officer may determine the competitive range, conduct discussions with offerors in the competitive range, and request final proposal revisions from those offerors. These revised proposals will be evaluated by the Source Selection Evaluation Board (SSEB) and the Financial Liaison Advisor (FLA) and written results will be provided to the Source Selection Authority (SSA). Award will be based on overall best value and will not necessarily be made to the low offeror.

*Id.* Because plaintiff challenges the Army's price realism analysis of He & I's final price proposal, and the adequacy and fairness of discussions held with DMS, the court will restrict its account of the extensive history of this procurement to events relevant to those actions by the government.

## II. Proposal Evaluations and Initial Award

### A. Initial Evaluation of Proposals

In April of 2007, defendant received proposals from three offerors in response to the solicitation: DMS, He & I, and White Hawk/Todd Joint Venture (White Hawk/Todd). *See* AR Tabs 8–10. Defendant subsequently established a SSEB to review the offerors' technical and performance proposals. *See* AR Tab 11. Defendant also requested a price analysis of the proposals from the FLA, Ms. [ ]. In a report dated June 7, 2007, Ms. [ ] identified a number of issues related to the proposals submitted by DMS and He & I. AR Tab 13.

With respect to the DMS proposal, Ms. [ ]'s report first noted that the price proposal included a line item for RSM cost data in the amount of [ ] per year that was not included in the cost totals for the proposal. AR at 1040. The report also noted that the indirect labor salaries proposed by DMS were approximately [ ] higher than salaries obtained by Ms. [ ] from Internet sources for similar occupational descriptions. AR at 1041. The report stated that substituting the salary amounts found on the Internet by Ms. [ ] for those proposed by DMS would reduce the base coefficient for CLIN 0001AA from [ ] to [ ]. *Id.* Finally, the report indicated that the non-labor costs allocated by DMS to vehicle gas, maintenance, and insurance (VGMI) was nearly three times as much as what DMS had allocated for the vehicles themselves, and expressed the FLA's opinion that the VGMI costs appeared to be overstated. AR at 1043–44. Ms. [ ] stated that she was unable to perform a price realism analysis on the price proposal submitted by He & I because that proposal did not include an adequate breakdown of the cost data needed to complete such an analysis. AR at 1044. The report further noted, however, that the FLA was able to reconcile the summary data in He & I's proposal with its price coefficients. AR at 1040. Ms. [ ] saw no problems with the price realism of DMS's proposal. AR at 1044.

---

5. Price analysis techniques, and the differences between the terms "price reasonableness" and "price realism," will be discussed in more detail *infra.* At the risk of over-simplification, a price reasonableness analysis has the goal of preventing the government from paying too much for contract work. A price realism analysis, on the other hand, investigates whether the contractor is proposing a price so low that performance of the contract will be threatened. *See* AR at 2764 (Army guidance document discussing the distinction between price reasonableness and price realism).

### B. First Round of Discussions, October 2007

The Army created a competitive range of all three offerors in September 2007, AR Tab 17, and mailed discussion letters to these contractors on October 2, 2007, AR Tab 18. In the letter to DMS, defendant identified a number of elements in DMS's technical proposal that required supplementation or clarification. AR at 1145–46. The Army's letter also noted that DMS's price proposal identified a line item for RSM cost data, but failed to include this line item in the calculation of its price coefficient. AR at 1145. The letter directed DMS to indicate whether it intended to include that line item in its price coefficient and requested an updated coefficient in the event that DMS elected to include the RSM cost data line item in its calculations. *Id.*

In its discussion letter to He & I, defendant requested clarification of three areas of He & I's technical proposal. AR at 1149–50. In addition, the letter informed He & I that its price proposal had failed to include sufficient data to support its price coefficients. In that regard, the letter requested the following information:

> Please address general price components including, but not limited to, materials, direct labor, indirect costs, overhead, and profit. Please include a cost breakdown for each price component. For example, for direct labor, please identify each labor category along with the number of Full Time Equivalents, rate and extended costs. The proposed profit rate shall be supported with quantitative evaluation of market conditions, anticipated order volume and risk assessment in addition to being justified with narrative rationale.

AR at 1149. All of the discussion letters sent by defendant instructed the offerors to review their entire proposal. AR at 1145, 1149, 1151.

All three offerors submitted revised proposals to defendant in early October 2007. *See* AR Tabs 19–21, 73. The SSEB convened on October 12, 2007 to evaluate the revised proposals. *See* AR Tab 22. Ms. [ ] performed a price analysis on the revised proposals on October 17, 2007. *See* AR Tabs 23 (missing two pages), 76 (complete version). In its revised proposal, DMS included the previously omitted line item in its coefficient calculation, which resulted in a small increase in its price coefficients and in its overall price. AR at 2708. Even after that increase, however, DMS remained the lowest overall bidder. AR at 2707. The FLA's report noted that while He & I had provided a number of new coefficient components apparently representing various cost categories and an extended narrative explaining its anticipated costs, it did not provide the specific cost data requested in the discussion letter. AR at 2709. The report concluded that the revised DMS price proposal was realistic, but that Ms. [ ] was unable to perform a price realism analysis on the revised He & I proposal.[6] AR at 2707, 2714.

### C. A Short–Lived Contract Award to DMS

The SSA noted that He & I had failed to provide certain requested information as to its costs, but concluded that there was no performance risk from He & I's price, and that He & I's price was realistic overall, citing Federal Acquisition Regulation (FAR) 15.404–1(d)(3), 48 C.F.R. § 15.404–1(d)(3) (2008). AR at 1826–27. The Army reasoned that He & I had complied with material solicitation requirements regarding documentation of its costs, and that there was no logical reason to find He & I's price to be unrealistic. AR at 1848–49. However, the SSA concluded that DMS provided the best value to the government and that DMS's price was reasonable; therefore, the SSA directed that the contract be awarded to DMS. AR at 1827. DMS was notified that it was the successful offeror on November 30, 2007. AR at 1853.

### III. Protests, Final Proposal Revisions and More Protests

#### A. DMS's Contract is Terminated for the Convenience of the Government and Award to He & I is Proposed

White Hawk/Todd protested the award to DMS, arguing that DMS did not meet the

---

6. Ms. [ ] used the terms "price realism" and "cost realism" interchangeably in her price proposal evaluations. *Compare* AR at 1039, 1044 *with* AR at 2707, 2714.

business size limitation specified by the solicitation. AR Tab 30. White Hawk/Todd's size protest, and, in particular, White Hawk/Todd's standing to bring such a protest, has been the subject of protracted litigation, which now continues before another judge of this court.[7] He & I filed its own protest of the award to DMS with the Government Accountability Office (GAO), which, due to proposed corrective action by the Army, was dismissed. AR Tab 31. A new SSEB was formed to re-evaluate the previously submitted proposals of the three offerors. AR Tab 32. Based on the re-evaluation of proposals, changes in the ratings for various technical elements led the SSA to direct contract award to He & I. AR at 2016. The contract award to DMS was terminated for the convenience of the government on July 7, 2008. AR Tab 38.

### B. Second Round of Discussions, October 2008

On July 29, 2008, DMS filed a pre-award protest with GAO regarding the proposed award of the contract to He & I. AR Tab 40. Because the Army proposed corrective action in response to DMS's protest, GAO dismissed the protest. *Id.* The Army again appointed a SSEB, AR Tab 42, which re-evaluated the previously submitted proposals of the three offerors. On October 30, 2008, the Army sent discussion letters to the offerors requesting revised proposals.[8] AR Tab 44.

The Army's discussion questions to DMS focused on technical elements of DMS's proposal and perceived problems therein, and offered DMS an opportunity to revise its technical proposal. AR at 2118. DMS was also informed that it could update its price proposal. AR at 2118–19. He & I was similarly informed that it could revise its technical proposal, as well as its price proposal. AR at 2120–21. Revised proposals were due January 9, 2009.

In December 2008, the Army "requested a supplemental review and evaluation [of the October 2007 price proposals] in preparation of the receipt of revised proposals." AR at 2126. An Army price analyst, Mr. [ ], performed an additional analysis of the previously received price proposals. *Id.* Mr. [ ] indicated that he was able to augment previous price analysis techniques with a price reasonableness analysis, and determined that the offerors' October 2007 proposals were reasonably priced. AR at 2126–27.

DMS chose not to revise its price proposal, AR at 2246, whereas He & I made changes that lowered its coefficients, and, thus, its overall price for the proposal, AR at 2175–80. The Army sent offerors a letter on January 28, 2009, informing the offerors that discussions were now closed, and that a final revised proposal would be accepted no later than February 3, 2009. AR at 2423, 2427. None of the offerors updated their January 2009 revised proposals. AR Tab 54.

### C. First Price Analysis of Final Proposals by Mr. [ ]

Mr. [ ] performed an initial price analysis of the offerors' final price proposals, including He & I's revised price proposal, on February 9, 2009, and found He & I's price to be reasonable. AR at 2436–37. Mr. [ ] paid particular attention to the lower price in He & I's revised price proposal, which amounted to a reduction of approximately [ ] in the overall price for the base and option years of the contract. In this analysis, Mr. [ ] did not discuss whether He & I's revised price was realistic. The Army then determined that He & I was a responsible bidder and eligible under the SBA 8(a) program. AR Tab 58. Based on the final, revised proposals, the SSA recommended that the contract be awarded to He & I. AR at 2485.

Offerors were notified that He & I was the proposed awardee of the contract. AR Tab

---

7. On November 17, 2009, White Hawk/Todd filed a motion to intervene in this bid protest or, in the alternative, to consolidate this case with its size protest, *White Hawk Group, Inc. v. United States*, No. 09–374. The undersigned denied White Hawk/Todd's motion in an order dated November 20, 2009, and the judge in *White Hawk Group* denied a similar motion on December 4, 2009.

8. On October 30, 2008, the solicitation was amended and a revised Section M was provided to offerors. AR Tab 43. None of the changes to Section M alter language quoted in this opinion; thus, for consistency, the court's page citations to Section M of the solicitation are to AR Tab 7, even where the provisions cited apply to proposals received in 2009.

61. After DMS was debriefed on the procurement, DMS first lodged a business size protest with the SBA, which was denied on May 12, 2009. AR Tab 64. DMS then turned to GAO and filed a protest there, which was dismissed when the Army proposed to take limited corrective action. AR Tab 65. The proposed corrective action was to conduct a price realism analysis of the offerors' final proposals, and to issue a new source selection decision. AR at 2583.

### D. Second Price Analysis of Final Proposals by Mr. [ ]

On May 28, 2009, Mr. [ ] performed a supplemental price analysis of the offerors' price proposals, including He & I's final price proposal. AR Tab 66. Mr. [ ] found all of the price proposals to be realistic. AR at 2588. Mr. [ ] noted the risks associated with the prices proposed by each offeror, and determined that the government's interests in contract performance were adequately protected. *Id.* A new source selection decision, relying upon Mr.[ ]'s price analysis, including his conclusion that He & I's price proposal was realistic, again proposed that He & I be awarded the contract. AR at 2600–01. Because DMS and He & I were equally rated on other overall factors, He & I's realistic, lower price was determinative for contract award. AR at 2594, 2601, 2612–13.

### E. DMS Protests the Army's Price Realism Analysis and the Propriety of Discussions

The offerors were notified of the proposed contract award to He & I on June 26, 2009. AR Tab 69. On July 6, 2009, DMS again protested to GAO, pointing to, among other alleged problems with the Army's procurement decision, an inadequate price realism analysis of He & I's price proposal. AR Tab 70. On August 17, 2009, DMS lodged a supplemental protest with GAO alleging that the Army had failed to conduct meaningful and equal discussions with DMS in this procurement. AR at 2863–76.[9] GAO denied the protest on October 9, 2009, finding no flaws in the price realism analysis of He & I's proposal, or in the discussions held with DMS and He & I. AR at 2954–60. On October 28, 2009, DMS filed its bid protest in this court, again contesting the validity of the Army's price realism analysis of He & I's price proposal, and the propriety of discussions held with DMS and He & I.

## DISCUSSION

### I. Jurisdiction

This court "shall have jurisdiction to render judgment on an action by an interested party objecting to a solicitation by a Federal agency for bids or proposals for a proposed contract or to a proposed award or the award of a contract or any alleged violation of statute or regulation in connection with a procurement or a proposed procurement." 28 U.S.C. § 1491(b)(1) (2006). The jurisdictional grant is "without regard to whether suit is instituted before or after the contract is awarded." *Id.* Because DMS objects to the proposed award of the contract to He & I, this court has subject matter jurisdiction to entertain this bid protest.

### II. Standards of Review

#### A. Judgment on the Administrative Record

Rule 52.1(c) of the Rules of the United States Court of Federal Claims (RCFC) pro-

---

9. As part of the proceedings at GAO, the Army submitted the declaration of Mr. [ ], dated August 27, 2009, which attempts to expand upon the May 28, 2009 report describing the price realism analysis he performed on the offerors' final price proposals. AR at 2905–07. The court does not rely on Mr. [ ]'s declaration for its analysis of the issues in this bid protest, because the agency procurement decision reviewed here cannot be supported by analyses not before the agency at the time it made its award decision. *See, e.g., Arch Chems., Inc. v. United States,* 64 Fed.Cl. 380, 386 (2005) (stating that "courts reviewing an administrative record recognize that they must reject 'post hoc rationalizations' as a basis for the agency action") (citations omitted); *Al Ghanim Combined Group Co. Gen. Trad. & Cont. W.L.L. v. United States,* 56 Fed.Cl. 502, 510–11 (2003) (rejecting a *post hoc* declaration where "the declarant supplies the elements missing from the already completed [and fully explained] price analysis" in the administrative record); *All Seasons Constr., Inc. v. United States,* 55 Fed.Cl. 175, 177 (2003) (noting that "this Court lacks authority to uphold an agency action on grounds not considered by the agency" (citing *OMV Med., Inc. v. United States,* 219 F.3d 1337, 1343–44 (Fed.Cir.2000))).

vides for judgment on the administrative record. To review a motion, or cross-motions, under RCFC 52.1(c), the court asks whether, given all the disputed and undisputed facts, a party has met its burden of proof based on the evidence in the record. *Bannum, Inc. v. United States*, 404 F.3d 1346, 1356–57 (Fed. Cir.2005). The court must make factual findings where necessary. *Id.* The resolution of RCFC 52.1 cross-motions is akin to an expedited trial on the paper record. *Id.*

## B. Bid Protest Review

■■■■ As a threshold matter, the plaintiff in a bid protest case must show that it has standing to bring the suit. *Info. Tech. & Applications Corp. v. United States*, 316 F.3d 1312, 1319 (Fed.Cir.2003). Standing arises from prejudice, which is present if the plaintiff establishes that it is an interested party with a direct economic interest in the procurement. *Id.* (citing *Am. Fed'n of Gov't Employees v. United States*, 258 F.3d 1294, 1302 (Fed.Cir.2001) *(AFGE))*. Thus, bid protest standing is limited to those plaintiffs who are " 'actual or prospective bidders or offerors whose direct economic interest would be affected by the award of the contract or by the failure to award the contract.' " *Weeks Marine, Inc. v. United States*, 575 F.3d 1352, 1359 (Fed.Cir.2009) (quoting *AFGE*, 258 F.3d at 1302). A protestor possessing a "substantial chance" of winning the contract has a "direct economic interest" in the procurement, and has standing before this court.[10] *Rex Serv. Corp. v. United States*, 448 F.3d 1305, 1307–08 (Fed.Cir.2006) (citations omitted).

■■■■ As the United States Court of Appeals for the Federal Circuit has stated, "the proper standard to be applied in bid protest cases is provided by 5 U.S.C. § 706(2)(A) [(2006)]: a reviewing court shall set aside the agency action if it is 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.' " *Banknote Corp. of Am. v. United States*, 365 F.3d 1345, 1350–51 (Fed. Cir.2004) (citing *Advanced Data Concepts,*

*Inc. v. United States*, 216 F.3d 1054, 1057–58 (Fed.Cir.2000)). Under this standard, a procurement decision may be set aside if it lacked a rational basis or if the agency's decision-making involved a violation of regulation or procedure. *Impresa Construzioni Geom. Domenico Garufi v. United States*, 238 F.3d 1324, 1332 (Fed.Cir.2001) (citations omitted). *De minimis* errors in the procurement process, however, do not justify relief. *Grumman Data Sys. Corp. v. Dalton*, 88 F.3d 990, 1000 (Fed.Cir.1996) (citing *Andersen Consulting v. United States*, 959 F.2d 929, 932–33, 935 (Fed.Cir.1992)). The bid protest plaintiff bears the burden of proving that a significant error marred the procurement in question. *Id.* (citing *CACI Field Servs., Inc. v. United States*, 854 F.2d 464, 466 (Fed.Cir.1988)).

■■■■ The higher the degree of discretion allotted the contracting officer, the more difficult it is for a protestor to prove that the procurement decision was arbitrary or capricious. *Burroughs Corp. v. United States*, 223 Ct.Cl. 53, 617 F.2d 590, 597 (1980) (citing *Keco Indus., Inc. v. United States*, 203 Ct.Cl. 566, 492 F.2d 1200, 1203–04 (1974)). Negotiated procurements give a "breadth of discretion" to the contracting officer, and impose a heavier burden of proof on a protestor. *Id.* at 598 (citing *Keco*, 492 F.2d at 1204). In addition, the court may not substitute its judgment for the agency's expertise in procuring services to meet the needs of the government. *See, e.g., Ala. Aircraft Indust., Inc.-Birmingham v. United States*, 586 F.3d 1372, 1376 (Fed.Cir.2009) *(Alabama Aircraft)* (reversing this court when it "substitut[ed] ... the court's judgment for the agency's with regard to how the contract work should be designed" (citing *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43, 103 S.Ct. 2856, 77 L.Ed.2d 443 (1983))). Instead, the court must "determine whether the agency's ... analysis [of proposals] was consistent with the evaluation criteria set forth in the [solicitation]." *Id.* (citation omitted). The court will "sustain an agency action evincing rational reasoning and

---

10. *Weeks Marine* offers an alternative formulation of bid protest standing applicable in a preaward protest of the terms of a solicitation. 575 F.3d at 1362 (requiring that the protestor demonstrate a non-trivial competitive injury, rather than a substantial chance of contract award). Here, DMS is not challenging the terms of the solicitation, but the proposed award to He & I.

consideration of relevant factors." *Advanced Data Concepts,* 216 F.3d at 1058 (citation omitted).

■■■ " 'If the court finds a reasonable basis for the agency's action, the court should stay its hand even though it might, as an original proposition, have reached a different conclusion as to the proper administration and application of the procurement regulations.' " *Honeywell, Inc. v. United States,* 870 F.2d 644, 648 (Fed.Cir.1989) (quoting *M. Steinthal & Co. v. Seamans,* 455 F.2d 1289, 1301 (D.C.Cir.1971)). If, on the other hand, "the trial court determines [that] the government acted without rational basis or contrary to law when evaluating the bids and awarding the contract[,] ... it proceeds to determine, as a factual matter, if the bid protester was prejudiced by that conduct." *Bannum,* 404 F.3d at 1351. Plaintiff again bears the burden of proof, and must "show that there was a 'substantial chance' [plaintiff] would have received the contract award but for the [government's] errors in the [procurement] process." *Id.* at 1358 (citations omitted). If a protestor can show that there was a substantial chance that it would have won the contract award but for the procurement error of the agency, prejudice has been established. *Id.* at 1353 (citations omitted). "Prejudice is a question of fact." *Id.* (citing *Advanced Data Concepts,* 216 F.3d at 1057).

### III. Standing

■■■ Neither defendant nor intervenor-defendant has contested plaintiff's standing to bring this suit. The record shows that DMS had a substantial chance of winning the contract, but for the procurement errors alleged in the complaint. On November 5, 2007, DMS's proposal was rated to have the best overall value to the government and DMS was awarded the contract. AR at 1819. After that contract was terminated for the convenience of the government, DMS's final revised proposal for the contract work received comparable ratings to He & I's proposal for the technical and present and past performance factors, but He & I's lower price became the "determinative selection factor." *Id.* at 2484–85. But for the alleged errors in the evaluation of He & I's price, and the consequences of allegedly unequal and insufficient discussions with DMS, DMS would have had a substantial chance of being awarded the contract. Thus, DMS has standing to bring this bid protest.

### IV. Merits

#### A. The Adequacy of Defendant's Price Realism Analysis of He & I's Final Proposal

##### 1. Regulatory Framework

FAR 15.404–1, 48 C.F.R. § 15.404–1 (2008), has the general objective of "ensur[ing] that the final agreed-to price [of a government contract] is fair and reasonable." 48 C.F.R. § 15.404–1(a). FAR 15.404–1(d) defines the purpose and methodology of a cost realism analysis:

> Cost realism analysis is the process of independently reviewing and evaluating specific elements of each offeror's proposed cost estimate to determine whether the estimated proposed cost elements are realistic for the work to be performed; reflect a clear understanding of the requirements; and are consistent with the unique methods of performance and materials described in the offeror's technical proposal.

48 C.F.R. § 15.404–1(d)(1). Cost realism analysis is a technique that is applied to cost-reimbursement contracts. *See* 48 C.F.R. § 15.404–1(d)(2) ("Cost realism analyses shall be performed on cost-reimbursement contracts to determine the probable cost of performance for each offeror."). In what the FAR describes as "exceptional cases," cost realism analyses may also be used in fixed-price contract procurements:

> Cost realism analyses may also be used on competitive fixed-price incentive contracts or, in exceptional cases, on other competitive fixed-price-type contracts when new requirements may not be fully understood by competing offerors, there are quality concerns, or past experience indicates that contractors proposed costs have resulted in quality or service shortfalls. Results of the analysis may be used in performance risk assessments and responsibility determinations. However, proposals shall be

evaluated using the criteria in the solicitation, and the offered prices shall not be adjusted as a result of the analysis.

48 C.F.R. § 15.404–1(d)(3). A "price realism analysis," a term not employed in the FAR, examines the performance risk of proposals in a fixed-price contract procurement, with particular attention to the risk of low-priced proposals, and may include the cost realism analysis referenced in FAR 15.404–1(d).[11] *See, e.g., Erinys Iraq Ltd. v. United States,* 78 Fed.Cl. 518, 530 (2007) (noting that "the FAR is silent on how to conduct a price realism analysis") (citing 48 C.F.R. § 15.404–1); *Int'l Outsourcing Servs., L.L. C. v. United States,* 69 Fed.Cl. 40, 47 n. 7 (2005) ("Various commentators have recognized that the FAR provisions discussing "cost realism" provide guidance in conducting price realism analyses, where the offeror's proposed prices are unrealistically low.") (citation omitted); *Labat–Anderson Inc. v. United States,* 50 Fed.Cl. 99, 106 (2001) (discussing price realism and citing FAR 15.404–1(d)(3) as permitting the "use of cost realism analyses in fixed-price contracts in exceptional cases").

## 2. Caselaw and Commentary[12]

There are several general principles that guide the review of an agency's price realism analysis of proposals in a fixed-price contract procurement. It is commonly acknowledged that a contracting officer has broad discretion in conducting a price realism analysis. *See, e.g., Labat -Anderson,* 50 Fed.Cl. at 106 (stating that "the nature and extent of an agency's price realism analysis are matters within the agency's discretion") (citation omitted). This discretion is bounded by the evaluation criteria stated in the solicitation. *See, e.g., Afghan Am. Army Servs. Corp. v. United States,* No. 09–388C, 2009 WL 3768441, at * 12 (Fed.Cl. Nov.4, 2009) *(Afghan American)* (stating that "the nature and extent of a price realism analysis is ultimately within the sound exercise of the agency's discretion, unless the agency commits itself to a particular methodology in a solicitation"); *see also* 48 C.F.R. § 15.404–1(d)(3) (stating that "proposals shall be evaluated using the criteria in the solicitation"). When a solicitation is silent as to the particulars of a price realism analysis, the agency's discretion in conducting the analysis is "even more pronounced." *Info. Scis. Corp. v. United States,* 73 Fed.Cl. 70, 102 (2006) (citations omitted). An agency's price-realism analysis must not, however, rely on "irrational assumptions or critical miscalculations." *OMV Med., Inc. v. United States,* 219 F.3d 1337, 1344 (Fed.Cir.2000).

The purpose of a price realism analysis has been described as a verification that the offeror's price is not overly optimistic and impractically low:

> Price realism is not ordinarily considered in the evaluation of proposals for the award of a fixed-price contract, because these contracts place the risk of loss upon the contractor. However, in light of various negative impacts on both the agency and the contractor that may result from an offeror's overly optimistic proposal, an agency may, as here, expressly provide that a price realism analysis will be applied in order to measure the offerors' understanding of the requirements and/or to assess the risk inherent in an offeror's proposal.

*Pemco Aeroplex, Inc.,* B–310372.3, 2008 CPD ¶ 126, 2008 WL 2684841, at *5 (Comp.Gen. June 13, 2008) (citation omitted); see also *Afghan American,* 2009 WL 3768441, at *11 (noting that price realism analyses are not

---

11. Price realism is differentiated from price reasonableness. A price realism analysis "is analysis to determine if the offeror's proposed prices are *unrealistically low.*" Ralph C. Nash & John Cibinic, *Price Realism Analysis: A Tricky Issue,* 12 No. 7 Nash & Cibinic Rep. ¶ 40 (July 1988) (citing 48 C.F.R. § 15.404–1(d)(1), (3)). The evaluation of price reasonableness, on the other hand, has the aim of preventing the government from paying too high a price for a particular contract. *Serco Inc. v. United States,* 81 Fed.Cl. 463, 494 n. 48 (2008) (citation omitted).

12. In addition to cases decided by the Federal Circuit and this court, GAO bid protests discuss many of the claims asserted here, and, in many instances, provide a valuable perspective. *See Planning Research Corp. v. United States,* 971 F.2d 736, 740 (Fed.Cir.1992) (stating that while Comptroller General "decisions are not binding authority, they may nevertheless be considered because of the Comptroller General's experience in dealing with bid protests" (citing *United States v. Lockheed Corp.,* 817 F.2d 1565, 1567 (Fed.Cir. 1987))).

normally required in fixed-priced IDIQ task order contracts, because "the fixed-price task order puts the risk of underpriced offers on the contractor"). A variety of techniques may be utilized in the agency's assessment of performance risk from low bid prices. See, e.g., *Grove Res. Solutions, Inc.*, B–296228, B–296228.2, 2005 CPD ¶ 133, 2005 WL 1551222, at *5 (Comp.Gen. July 1, 2005) ("Agencies have discretion in determining whether an offeror's proposed prices are realistic, and ... are free to use a number of techniques in assessing price realism."). "In reviewing protests challenging an agency's evaluation of [price realism], our focus is whether the agency acted reasonably and in a way consistent with the solicitation's requirements." *Pemco Aeroplex*, 2008 WL 2684841, at *5 (citation omitted).

### 3. Price Realism Evaluation Criteria in the Solicitation

■ Plaintiff argues that the solicitation in this case required a detailed "four-point" price realism analysis of proposals. *See* Pl.'s Reply at 8. In plaintiff's view, the price realism analysis identified in the solicitation included these four components: cost reasonableness, completeness of the price coefficient in terms of the government's requirements, value in meeting the government's requirements, and acceptable performance risk. *Id.* This is a tortured and indefensible reading of the solicitation. At the outset the court notes that the only reference to the "realism" of each offeror's proposal is contained in these two sentences of Section M of the solicitation:

> A proposal that is unrealistic in terms of technical quality or price will be deemed reflective of an inherent lack of technical competence or indicative of failure to comprehend the complexity and risks of the contractual requirements. Such proposals may be rejected as unacceptable without further evaluation or discussion.

AR at 318. Furthermore, there are no "four points" in the solicitation's discussion of price realism. If plaintiff believes that the Army should have been more explicit and should have proposed a more detailed price realism analysis in the solicitation, the time for lodging such a protest has long since passed.

*See Femme Comp Inc. v. United States*, 83 Fed.Cl. 704, 756 (2008) (noting that "[c]hallenges to the extent and scope of [an agency's] price analysis ... are [in some cases] challenges to the terms of the solicitation, and should have been dealt with 'prior to the close of the bidding process' " (quoting *Blue & Gold Fleet, L.P. v. United States*, 492 F.3d 1308, 1313 (Fed.Cir.2007))). If, on the other hand, plaintiff is proposing that the court should substitute plaintiff's version of a detailed, four-point price realism analysis for the simply-stated price realism concerns set forth in the solicitation, the Federal Circuit has made it clear that solicitation evaluation criteria control in the review of an agency's price realism analysis of proposals:

> The trial court's duty was to determine whether the agency's price-realism analysis was consistent with the evaluation criteria set forth in the RFP, *see Galen Med. Assocs., Inc. v. United States*, 369 F.3d 1324, 1330 (Fed.Cir.2004), not to introduce new requirements outside the scope of the RFP. The court's attempt to rewrite the RFP ... went beyond the scope of the court's review, and amounted to an impermissible substitution of the court's judgment for the agency's with regard to how the contract work should be designed.

*Alabama Aircraft*, 586 F.3d at 1375–76.

The solicitation is not silent, however, as to the elements of the Army's price and cost analyses of proposals in this procurement, and two sentences in particular appear to be relevant to a price realism analysis:

> Price/Cost will be evaluated using price and/or cost analysis techniques. The price will be evaluated to determine cost reasonableness and completeness of the coefficient in terms of the government's requirement.

AR at 319. The first sentence is of a general nature and notes that the Army may choose among price analysis and cost analysis techniques for the evaluation of the offerors' price proposals. The second sentence is more specific and warns that the Army will evaluate cost reasonableness, which is a cost analysis technique that could help identify unrealistic price proposals by identifying un-

realistic costs in a price proposal.[13] The second sentence also states that each offeror's price coefficient will be evaluated for completeness, a review which might be useful in determining the accuracy, and thus the realism, of each offeror's price.

Because the solicitation is silent as to the precise methodology of the price realism analysis contemplated by the Army, the Army enjoyed broad discretion in conducting its price realism analysis. Nonetheless, the Army identified certain price/cost analyses that it sought to undertake, and because these analyses would appear to have utility in a price realism analysis, the court will verify that the Army conducted the promised analyses. The court will also consider whether the results of these analyses are consistent with the Army's conclusion that all of the offerors' price proposals were realistic. The court notes, however, that the price realism "analysis" proposed in the solicitation is lacking in specifics and accordingly has limited vulnerability to a challenge on "adequacy" grounds.[14]

 The task before the court is to determine whether the Army's price realism analysis of final proposals was rational and consonant with the solicitation. Specifically, the Army must have assessed the performance risk of He & I's low price. As a part of its price/cost analysis, the Army must have

examined critical elements of He & I's costs, and must have considered the completeness of He & I's price coefficient. As the court explains below, the Army's price realism analysis of final proposals was rational and carried forth the evaluation promised in the solicitation.

#### 4. Final Price Proposals Evaluation

#### a. Completeness of He & I's Price Coefficient

In 2007, Ms. [ ], the FLA, criticized He & I's first two price proposals, stating that He & I's price coefficient supporting data was inadequate for a price realism (or cost realism) analysis. AR at 1044, 2714. The Army's contracting team, however, questioned whether the FLA's concerns about He & I's supporting data had identified a material flaw in He & I's 2007 price proposals. AR at 1848–49. Despite the FLA's concerns, the Army, relying on advice from legal counsel and a review of the data supplied by He & I, viewed He & I's 2007 price proposal as having satisfied the "completeness of the coefficient" requirement identified in the solicitation. *Id.* The SSA decided that He & I's proposed price coefficient was adequately documented, and concluded that He & I's submitted price presented no performance risk. AR at 1826–27. The court finds noth-

---

13. Cost reasonableness and cost realism are distinguishable, but both of these analytical frameworks critically examine the cost elements of a price proposal. *See* 48 C.F.R. § 15.404–1(a)(4) ("Cost analysis may ... be used ... to determine cost reasonableness or cost realism."). Plaintiff references FAR provisions that address both cost reasonableness, *see* Pl.'s Mot. at 8 (citing 48 C.F.R. § 15.404–1(c)(1)), and cost realism, *see* Pl.'s Mot. at 11 (citing 48 C.F.R. § 15.404–1(d)(1)). Plaintiff's main concern, however, is that the Army's price realism analysis did not incorporate an adequate cost realism analysis, so as to avoid unrealistically low bids. *Compare* Pl.'s Mot. at 12 (describing the solicitation's price realism analysis as a determination of whether "the price proposal is inconsistent with the technical approach" and is thus "unrealistic") *with* FAR 15.404–1(d)(1) (stating that "[c]ost realism analysis is the process of independently reviewing and evaluating specific elements of each offeror's proposed cost estimate to determine whether the estimated proposed cost elements are realistic for the work to be performed"). To the extent that the solicitation term "cost reason-

ableness" is applicable to the price realism analysis conducted in this procurement, the court agrees with plaintiff that cost realism, not cost reasonableness, is the more pertinent analytical framework. *See* AR at 1044 (FLA report) (discussing the price realism of proposals); *id.* at 2714 (FLA report) (discussing the cost realism of proposals); *id.* at 2588 (Mr. [ ]'s Final Price Proposals Evaluation) (examining the performance risk of each offeror's most significant price coefficient subfactor to confirm that the offerors' total price coefficients were realistic).

14. Intervenor-defendant argues that no price realism analysis of offers was required by the language of the solicitation. The government disagrees with intervenor-defendant on this point and sides with plaintiff, asserting that a price realism analysis was called for by the solicitation. However, even if the court agreed with He & I's argument, the Army conducted and relied upon a price realism analysis of proposals, and that analysis must have had a rational basis to survive this court's review.

ing irrational in the Army's positive assessment of the completeness of He & I's price coefficient in November 2007.

Mr. [ ] conducted the evaluation of final price proposals on February 9, 2009 and May 28, 2009. AR Tabs 55, 66. In doing so, he explicitly relied on three prior price analyses of proposals from these offerors, including the analyses performed by Ms. [ ]. AR at 2436, 2586. Mr. [ ], unlike the FLA, "accept[ed] each offeror's method of calculating its respective coefficients and the individual sub-factors." AR at 2588. Mr. [ ]'s assessment of the completeness of He & I's price coefficient has not been shown to be irrational.

In 2007 and 2009, He & I submitted similar supporting data for its price coefficient. *Compare* AR at 2175–80 *with* AR at 2677–81. Mr. [ ] noted that the solicitation required evaluation of the completeness of price coefficients in the proposals he was reviewing. AR at 2436. Mr. [ ] accepted He & I's data as adequate for his analysis, and relied on He & I's price coefficient supporting data. AR at 2437, 2587–88. Mr. [ ]'s conclusion that He & I's price coefficient satisfied the solicitation's requirements is fully supported by the record in this case and has not been shown to be irrational. The SSA accepted Mr. [ ]'s analysis, and plaintiff has not shown that the Army's positive evaluation of the completeness of He & I's price

coefficient was irrational.[15] For these reasons, the court finds that the Army rationally conducted an evaluation of the completeness of He & I's price coefficient, as required by the solicitation.[16]

### b. Cost Analysis of He & I's Final Price Proposal

Mr. [ ] twice analyzed the cost elements of He & I's final price proposal. In February 2009, Mr. [ ] generally noted that He & I's final price had been reduced by approximately [ ] for the base year plus four option years. AR at 2437. Mr. [ ] noted particular reductions in price coefficients for the CLINs in the contract, the "AA," "AB," "AC," and "AD" price coefficients. *Id.* Mr. [ ] remarked upon the justifications for these lower coefficients, stating that these reductions "reflect[ed] a lower [ ]." *Id.* The Army's price analyst also reported that He & I explained its cost element revisions by referencing historical job order data, and by consulting the 2009 edition, not the 2007 edition of the RSM cost data book. *Id.* Mr. [ ] concluded that He & I, in its revised price proposal, had [ ]. *Id.*

It is evident from Mr. [ ]'s February 2009 report that the Army had at least begun a cost analysis of He & I's final price proposal, and had found He & I's costs to be acceptable, based upon this preliminary analysis. The February 2009 report does not specifically state, however, that He & I's revised costs were reasonable and realistic. There-

---

15. One of plaintiff's arguments in this regard is that He & I's price coefficients did not include enough of the indirect cost subfactors listed in Section L of the solicitation. *See* Pl.'s Mot. at 16 (stating that "He & I failed to include in its coefficient each cost element required by the Solicitation"). The court does not read the solicitation to require more subfactor detail than He & I included in its price coefficient. *See* AR at 311–12 (noting that a price coefficient represents a contractor's indirect costs). Plaintiff's suggestion that the solicitation required more subfactor detail than He & I provided is not consistent with either the solicitation or the record in this case. *See* AR at 1848–49 (Price Negotiation Memorandum) (noting that He & I quantified some of the categories of indirect costs listed in Section L of the solicitation, and finding this level of detail to be responsive to the material requirements of the solicitation and sufficient).

16. Plaintiff argues that because He & I's revised price proposal lacked a revised Section B, containing specific CLIN costs, He & I's revised

price proposal was either unresponsive to the solicitation or incomplete for the purposes of a price realism analysis. Pl.'s Mot. at 19–20. The court disagrees. He & I submitted all of the information required to substantiate the CLIN costs of its revised proposal and to support a price realism analysis, but neglected to format some of this information in a new Section B. *See* AR Tab 49. A qualified proposal will not be rejected for mere clerical errors, when all material information required by the solicitation is present. *See, e.g., Am. Spare Parts, Inc.,* B–224745, 87–1 CPD ¶ 4, 1987 WL 101290, at *2 (Comp.Gen. Jan.2, 1987) ("A solicitation requirement is not material, however, simply because bidders are warned that bids will be rejected should they fail to furnish information, if the government does not need the information in order to evaluate bids or the information otherwise does not have an impact on the bidder's promise to perform as specified.").

fore, as of February 2009, the cost realism of He & I's price proposal had only been summarily addressed.

Mr. [ ] conducted a second evaluation of the offerors' final price proposals in May 2009, and stated that he relied upon previous price evaluations he had conducted, as well as those evaluations conducted by the FLA, Ms. [ ]. AR Tab 66. Mr. [ ]'s second evaluation of final price proposals supplemented his first evaluation, and explicitly addressed price realism. AR at 2586–87. Mr. [ ] explained his methodology, which was to focus his analysis primarily on "the largest cost driver" subfactor, the Book Efficiency/Adjustment Factor, as it affected the AA CLINs, which constitute 95% of the contract's work in terms of dollar value. AR at 2587. Mr. [ ] also examined He & I's justifications for its price coefficients, and whether other subfactors of its price coefficients were in line with those of other offerors. AR at 2588. This methodology addressed both cost reasonableness, through a comparison of the offerors' Book Efficiency/Adjustment Factors, and cost and price realism, through an analysis, in particular, of whether the individual cost subfactors in He & I's final price proposal reflected an understanding of the contract work. AR at 2587–88.

Mr. [ ]'s methodology and conclusions were rational. The offerors' Book Efficiency/Adjustment Factors were [ ] for White Hawk/Todd, [ ] for He & I, and [ ] for DMS. AR at 2587. These factors, based on Mr. [ ]'s comparative analysis, were deemed to be acceptable. *Id.* The offerors' Book Efficiency/Adjustment Factors were also judged to be realistic, based on the justifications for these factors provided by each offeror. AR at 2587–88. Mr. [ ] noted that He & I's subfactors of its price coefficients, other than the largest cost driver expressed in the Book Efficiency/Adjustment Factor, were similar to the subfactor rates in other proposals. AR at 2588. The court finds that Mr. [ ]'s two evaluations of the offerors' costs in their final price proposals fulfilled the solicitation's requirements for a cost analysis of price proposals.

### c. Performance Risk of He & I's Price

The court now turns to plaintiff's allegation that the Army conducted an inadequate price realism analysis of He & I's final price proposal. The solicitation required a rational assessment of the performance risk of He & I's low price. Mr. [ ] examined, first, the reduction in He & I's overall price, from [ ] to [ ]. AR at 2437. Mr. [ ] concluded that He & I had "opt[ed] for a[ ]." *Id.*

Mr. [ ] later examined whether or not this pricing strategy was realistic. The Army's price analyst verified that the largest cost driver in He & I's price proposal was in line with the same factor found in other offerors' proposals. AR at 2587–88. Mr. [ ] also examined the justification for He & I's Book Efficiency/Adjustment Factor, and found these justifications to be acceptable. AR at 2588. Mr. [ ] reasoned, for example, that the higher performance risk of the low-priced subfactors in He & I's price coefficients, such as the [ ] and [ ] subfactors, was balanced by the lower performance risk of He & I's Book Efficiency/Adjustment Factor, the largest cost driver in He & I's price coefficients. *See* AR at 2588 ("The evaluator recognizes [He & I's] total proposed coefficient of [ ] offers slightly less room for calculation error than does [DMS's] total coefficient of [ ] . . . [,] [h]owever, [He & I] offers significantly less risk in the key factor, 'Book Efficiency/Adjustment Factor' . . . , and similar rates in the remaining factors."). Finally, Mr. [ ] noted that there was only a 2.225% difference between the base year prices proposed by DMS and those proposed by He & I. *Id.*

The solicitation in this case gave broad discretion to the Army in its choice of price realism methodology. *Information Sciences,* 73 Fed.Cl. at 102 (noting that broad discretion is allotted to the contracting officer when the solicitation is silent as to the specifics of a price realism analysis). The court finds nothing irrational in the extent or scope of the price realism analysis conducted by the Army in this procurement, and is not at liberty to substitute other price realism measures for those chosen by the Army. *Alabama Aircraft,* 586 F.3d at 1375–76. The analytical techniques used here led Mr. [ ] and the SSA to conclude that He & I's price

proposal was realistic.[17] AR at 2588, 2601. The court finds that the Army conducted a rational price realism analysis in accordance with the terms set forth in the solicitation.

### B. Meaningful Discussions

#### 1. Regulatory Framework

FAR 15.306(d)(3), 48 C.F.R. § 15.306(d)(3) (2008) provides that:

> At a minimum, the contracting officer must ... indicate to, or discuss with, each offeror still being considered for award, deficiencies, significant weaknesses, and adverse past performance information to which the offeror has not yet had an opportunity to respond. The contracting officer also is encouraged to discuss other aspects of the offeror's proposal that could, in the opinion of the contracting officer, be altered or explained to enhance materially the proposal's potential for award. However, the contracting officer is not required to discuss every area where the proposal could be improved. The scope and extent of discussions are a matter of contracting officer judgment.

48 C.F.R. § 15.306(d)(3). Plaintiff suggests that discussions between the Army and DMS in October 2007 and October 2008 failed to conform to this standard, because the discussions with DMS were not meaningful. Pl.'s Mot. at 25–28. In its reply brief, plaintiff also alleges that DMS was misled by discussions with the Army.[18] Pl.'s Reply at 16, 22. The court disagrees with plaintiff's arguments. There is ample evidence in the record to show that the discussions with DMS satisfied the standard set forth in FAR 15.306(d)(3), and that discussions with DMS were not misleading.[19] The court turns first to a brief review of analogous caselaw on the topic of meaningful discussions with offerors in a negotiated procurement.

#### 2. Caselaw

A "contracting officer has broad discretion in conducting discussions." *Advanced Data Concepts, Inc. v. United States,* 43 Fed.Cl. 410, 422 (1999) (citations omitted), *aff'd on other grounds,* 216 F.3d 1054 (Fed. Cir.2000). For discussions to be meaningful, they must "generally lead offerors into the areas of their proposals requiring amplification or correction, which means that discussions should be as specific as practical considerations permit." *Id.* (internal quotations and citations omitted); *see, e.g., ManTech Telecomms. & Info. Sys. Corp. v. United States,* 49 Fed.Cl. 57, 71 (2001) (stating that meaningful discussions have not occurred "if an offeror is not advised, in some way, of defects in its proposal that do not meet the requirements of the solicitation") (citations omitted). When discussions are held, "a contracting officer must address those elements of a proposal that suggest an offeror's misunderstanding of a solicitation's require-

---

**17.** Plaintiff alleges that He & I "gamed" its price coefficient and that the Army did not correctly assess the performance risk of He & I's "below cost offer." Pl.'s Mot. at 16. The court notes that below-cost offers, also known as "buy-in" offers, are not prohibited, and that a price realism analysis will not necessarily reject below-cost offers from consideration. *See* Nash & Cibinic, *supra* note 11 ("An unrealistically low price can indicate that the offeror does not understand the work to be done. However, such a conclusion is not inevitable because the offeror might have intentionally offered a low price to win the competition (the so-called 'buy-in').").

**18.** Defendant had no opportunity to brief a response to plaintiff's misleading discussions argument, because the parties filed simultaneous cross-motions and, subsequently, simultaneous reply briefs. Arguments raised for the first time in a reply brief are not properly before the court. *See Arakaki v. United States,* 62 Fed.Cl. 244, 246 n. 9 (2004) ("The court will not consider argu-

ments that were presented for the first time in a reply brief or after briefing was complete." (citing *Novosteel SA v. United States,* 284 F.3d 1261, 1274 (Fed.Cir.2002))). The court will nonetheless discuss plaintiff's "misleading discussions" allegation, *infra.*

**19.** Plaintiff also cites briefly to 48 C.F.R. § 15.306(b)(3)(i) (2008) and 48 C.F.R. § 15.306(d)(1)-(2) (2008). Pl.'s Mot. at 25. To the extent that these statements in the FAR are relevant to plaintiff's arguments, the discussions with DMS met the standards expressed in these provisions. Specifically, the court notes that FAR 15.306(b)(3)(i) is irrelevant when an agency has found no ambiguities or errors in a proposal, that discussions with DMS were appropriately tailored to DMS's proposal pursuant to FAR 15.306(d)(1), and that discussions with all three offerors appropriately furthered the government's objective of obtaining best value in the selection process in accordance with FAR 15.306(d)(2).

ments." *Structural Assocs., Inc./Comfort Sys. USA (Syracuse) Joint Venture v. United States*, 89 Fed.Cl. 735, 743–44 (2009) *(Structural Associates)*. The court in *Structural Associates* observed, however, that such "discussions ... are designed to point out shortcomings in an offeror's proposal as judged from the standpoint of the government's stated needs, rather than from the standpoint of the proposal's relative competitiveness." *Id.* Indeed, "[a]gencies need not discuss every aspect of the proposal that receives less than the maximum score or identify relative weaknesses in a proposal that is technically acceptable but presents a less desirable approach than others." *WorldTravelService v. United States*, 49 Fed.Cl. 431, 439 (2001) (internal quotations and citations omitted).

*Structural Associates* is an instructive example of the requirement that discussions with offerors be meaningful. The plaintiff in that case complained that during discussions "the contracting officer made no mention of the issue that the SSA ultimately found dispositive" for awarding the contract. *Structural Associates*, 89 Fed.Cl. at 743. The court nonetheless held that discussions with the protestor were meaningful, because the evaluation of the protestor's proposal had not identified any deficiencies or significant weaknesses. *Id.* at 743–44. Under FAR 15.306(d)(3), the court reasoned that the agency was not required to discuss the element of the protestor's proposal that eventually proved determinative of the contract award, because that element was not a significant weakness or deficiency in its proposal. *Id.*

As to discussions regarding an offeror's costs, unless an offeror's costs constitute a significant weakness or deficiency in its proposal, the contracting officer is not required to address in discussions costs that appear to be higher than those proposed by other offerors. *SOS Interpreting, Ltd.*, B–287477.2, 2001 CPD ¶ 84, 2001 WL 527349, at *3 (Comp.Gen. May 16, 2001) (citation omitted). In other words, "if an offeror's costs are not so high as to be unreasonable and unacceptable for contract award, the agency may conduct meaningful discussions without raising the issue of the offeror's costs." *Yang Enters., Inc.; Santa Barbara Applied Research, Inc.*, B–294605.4, B–294605.5, B–294605.6, 2005 CPD ¶ 65, 2005 WL 832109, at *9 (Comp.Gen. April 1, 2005) (citation omitted). In essence, it is mandatory for the agency to discuss costs or pricing when the prices submitted in a firm's proposal "would preclude award to the firm." *Gen. Dynamics–Ordnance & Tactical Sys.*, B–401658, B–401658.2, 2009 CPD ¶ 217, 2009 WL 4023548, at *5 (Comp.Gen. Oct.26, 2009) *(General Dynamics)* (citation omitted). In *General Dynamics*, the Comptroller General determined that the protestor's pricing was not unreasonable, so as to require discussions, where high-priced items and favorable prices combined to produce a reasonable offer well within an acceptable overall bid price range. *Id.* Because the protestor was not precluded from winning the contract because of its costs, no discussions of the protestor's costs were necessary. *Id.*

Finally, caselaw from this court examining allegedly "misleading" discussions is sparse. *See, e.g., Academy Facilities Mgmt. v. United States*, 87 Fed.Cl. 441, 458–60 (2009) (considering a bid protest founded in part on allegations of misleading discussions); *Analytical & Research Tech., Inc. v. United States*, 39 Fed.Cl. 34, 48 (1997) (" 'An agency may not inadvertently mislead an offeror, through the framing of a discussion question, into responding in a manner that does not address the agency's concerns; or that misinforms the offeror concerning its proposal weaknesses or deficiencies; or the government's requirements.' ") (quoting *SRS Techs.*, B–254425, B–254425.2, 94–2 CPD ¶ 125, 1994 WL 576118, at *3 (Comp.Gen. Sept.14, 1994)). In bid protests at GAO, the Comptroller General has stated that "[i]t is a fundamental precept of negotiated procurement that discussions, when conducted, must be meaningful and must not prejudicially mislead offerors." *Metro Mach. Corp.*, B–281872, B–281872.2, B–281872.3, B–281872.4, 99–1 CPD ¶ 101, 1999 WL 385741, at *3 (Comp.Gen. April 22, 1999) (citations omitted). This court has similarly noted that "an agency's discretion in holding discussions 'is not a license to mislead an offeror.' " *AshBritt, Inc. v. United States*, 87 Fed.Cl. 344, 369 (2009)

(quoting *Gentex Corp. v. United States*, 58 Fed.Cl. 634, 653 (2003)).

■ This is not to say, however, that to avoid misleading an offeror discussions must address all aspects of a proposal that are less than optimal. *See WorldTravelService*, 49 Fed.Cl. at 439 (stating that "[a]gencies need not discuss every aspect of the proposal that receives less than the maximum score or identify relative weaknesses in a proposal that is technically acceptable but presents a less desirable approach than others"). Rather, discussions become misleading when communications from the government misdirect the protestor as it revises its proposal. *See, e.g., Metro Mach. Corp.*, 1999 WL 385741, at *5 (sustaining protest where "the agency's discussions effectively communicated to [the protestor] that its proposal ... was acceptable, ..., when, in fact, only a [radically different] proposal ... would have been considered acceptable"); *Ranor, Inc.*, B–255904, 94–1 CPD ¶ 258, 1994 WL 130018, at *3 (Comp.Gen. April 14, 1994) (sustaining protest where the protestor was told by the agency during discussions that its price was too low, although award was later made to an offerer whose price was similar to the protestor's initial bid price); *Vitro Servs. Corp.*, B–233040, 89–1 CPD ¶ 136, 1989 WL 240342, at *2–*3 (Comp.Gen. Feb.9, 1989) (sustaining protest where the deficiency noted in a discussion question was ambiguous, and the protestor's reasonable revision of its proposal after discussions was rejected as technically unacceptable); *Woodward Assocs., Inc.; Monterey Techs., Inc.*, B–216714, B–216714.2, 85–1 CPD ¶ 274, 1985 WL 52378, at *3 (Comp.Gen. March 5, 1985) (sustaining protest because a confusing phone call misled the protestor into believing proposal revisions would no longer be accepted). As these GAO decisions show, misleading discussions are characterized by communications from the government that are incorrect, confusing or ambiguous. *See, e.g., SRS Techs.*, 1994 WL 576118, at *4 (sustaining protest where the agency told the protestor to not lower certain prices in its offer, erroneously depriving the protestor of the opportunity to win the contract).

### 3. Discussions with DMS

■ Plaintiff argues that FAR 15.306(d)(3) required the Army to bring two aspects of DMS's price proposal, DMS's indirect labor salaries and DMS's vehicle gas, maintenance and insurance (VGMI) costs, to the attention of DMS during discussions in 2007 or 2008. Pl.'s Mot. at 25–27. In particular, plaintiff suggests that the Army was obligated to lead DMS into these areas of its proposal because DMS's indirect labor salaries and VGMI costs were either significant weaknesses or deficiencies that needed to be corrected. *Id.* at 25, 28; Pl.'s Reply at 16. Unfortunately for plaintiff's argument, the administrative record shows that these aspects of DMS's price proposal were never considered by the Army to be deficiencies or significant weaknesses in DMS's proposal. At worst, these two costs included in DMS's proposal were considered to be higher than necessary. *See* AR at 1041, 1043, 2710–11, 2713.

Each of the price analyses conducted by the government found DMS's prices to be satisfactory overall, under all of the measures and techniques used by Ms. [ ] and Mr. [ ], including price reasonableness and price realism measures. *See* AR at 1044, 2127, 2437, 2588, 2714. The results of these price analyses were adopted by the SSA, who concluded that DMS's price proposal was "reasonable, realistic, and complete." AR at 1827, 2015; *see also id.* at 2601 ("I accept the price analyst[']s finding."). The administrative record is devoid of any references to weaknesses, significant weaknesses, or deficiencies attributable to DMS's indirect labor salaries or VGMI costs, and this record cannot be read to suggest that the Army considered these two aspects of DMS's proposal to be impediments to award. Indeed, the Army did, in fact, award the contract to DMS in an early phase of this procurement, AR Tab 28, despite its indirect labor salaries and VGMI costs. Because these aspects of DMS's price proposal did not render DMS's proposal unacceptable for award, the Army was not obliged to raise these issues during discussions with DMS. *See Yang Enters., Inc.*, 2005 WL 832109, at *9. The discussions held with DMS were meaningful and met the standard

set forth in FAR 15.306(d)(3). *See World-TravelService*, 49 Fed.Cl. at 439 (stating that "[a]gencies need not discuss every aspect of the proposal that receives less than the maximum score or identify relative weaknesses in a proposal that is technically acceptable but presents a less desirable approach than others").

The court now turns to plaintiff's misleading discussions argument. Because the Army raised one price concern with DMS, and not DMS's indirect labor salaries and VGMI costs, plaintiff argues that DMS was misled into believing that only one adjustment to its price proposal was needed. Pl.'s Reply at 22 (complaining that the government's "laser beam focus on a single, relatively small price component ... misled [DMS] into maintaining its proposed price"). Unlike the GAO decisions cited *supra*, the record in this bid protest contains no misdirection by the government. An obvious omission in DMS's price proposal was pointed out, in a rational and neutral manner: "Your detailed price information included a line item for [RSM data costs]; however, this item was not included in the totals nor was it carried forward to the coefficient calculation. Please clarify your intention of either including or excluding this proposed item." AR at 1145. Nothing in this communication suggested that DMS should not review its price proposal for higher-than-necessary cost estimates. Nothing in this communication suggested that DMS's price proposal was too low, or that DMS should not consider lowering certain cost elements. The record does not show that the Army conducted misleading discussions with DMS.

At oral argument plaintiff advanced the proposition that it is misleading for the government to point to only one problem in a price proposal, when there are additional problems in that proposal. Tr. at 56 ("Once they undertook the discussion issue, and once they identified the [RSM data costs] as being the only problem they had with our price, they misle[ ]d us."). Plaintiff principally relied on a GAO decision, *Multimax, Inc. et al.*, B–298249.6 *et al.*, 2006 CPD ¶ 165, 2006 WL 3300346 (Comp.Gen. Oct.24, 2006), as support for plaintiff's argument that the discussions with DMS were misleading. Tr. at 55. *Multimax*, however, is easily distinguishable on its facts.

That GAO protest examined discussions with offerors wherein certain proposed labor rates, among 208 labor rates included in each offeror's proposal, were noted to be excessive. *Multimax*, 2006 WL 3300346, at *2, *9. The agency told two protestors during discussions that " '[y]our proposed labor rates are significantly higher than the Independent Government Cost Estimate (IGCE) rates for the following labor categories.... ' " *Id.* at *9 (quoting letters to protestors). The agency even confirmed, during oral discussions with one protestor, that the government's list of overly high labor rates provided in the letter was exhaustive. *Id.* at * 12 n. 6. The protest was sustained because "not only were offerors not adequately advised of all of their significantly overstated rates, but the agency's failure to identify the additional rates actually misled the offerors into believing that those rates did not require further adjustment." *Id.* at *10.

In this case, the Army did not choose a certain few unreasonably high cost categories to discuss with DMS, thereby fooling DMS into believing that all other cost categories in its price proposal were reasonably priced. The Army discussed with DMS an omitted cost detail that was not carried through in summary calculations, and completely avoided any commentary on the reasonableness of DMS's costs and prices. This case is not analogous to *Multimax*, and there is no evidence of misleading discussions in the record before the court.

DMS, along with the other offerors, was given repeated opportunities to revise its price proposal. AR Tabs 44, 52, 57. DMS was also aware that its competitors had been made privy to DMS's October 2007 bid price. Compl. ¶ 39. Nonetheless, DMS did not choose to revise its October 2007 price proposal. The Army is not responsible, through misleading discussions or any other alleged violation of FAR 15.306(d)(3), for DMS's decision to maintain its bid price at a level that proved to be determinative in the proposed award of the contract to He & I.

## C. Discussions Must Not Be Unequal

### 1. Regulatory Framework

Discussions must be held with each offeror in the competitive range of a negotiated procurement. 48 C.F.R. § 15.306(d)(1) (2008). FAR 15.306(e) provides that the government, when conducting discussions with offerors in the competitive range, may not "engage in conduct that ... [f]avors one offeror over another." 48 C.F.R. § 15.306(e) (2008); *see also* 48 C.F.R. § 3.101–1 (2008) ("Government business shall be conducted in a manner above reproach and, except as authorized by statute or regulation, with complete impartiality and with preferential treatment for none."). It is also true, however, that discussions must be "tailored to each offeror's proposal." 48 C.F.R. § 15.306(d)(1); *see also* 48 C.F.R. § 1.102–2(c)(3) (2008) ("All contractors and prospective contractors shall be treated fairly and impartially but need not be treated the same."). Plaintiff asserts that the Army held unequal discussions with He & I and DMS and thus violated 48 C.F.R. § 15.306(e) and 48 C.F.R. § 3.101–1. Pl.'s Mot. at 29–35. The court disagrees. The administrative record shows that the discussions with He & I and DMS were not unequal and were fair. The court turns first to a brief discussion of analogous caselaw on the topic of unequal discussions.

### 2. Caselaw

 Unequal discussions are characterized by impermissible and prejudicial conduct favoring one offeror over another. *E.g., Gentex,* 58 Fed.Cl. at 653 (citing 48 C.F.R. § 15.306(e)(1)). For example, a procuring agency may not withhold a crucial and advantageous piece of information from one offeror while providing it to another. *See, e.g., Metcalf Constr. Co. v. United States,* 53 Fed.Cl. 617, 634–35 (2002) (holding, in that case, that "the bidders were treated unequally where one bidder was advised, in no uncertain terms, not to exceed the budget ceilings, and a second bidder under identical circumstances was not"). In addition, each offeror within the competitive range must be

afforded a "similar opportunity" to revise its proposal. *Dynacs Eng'g Co. v. United States,* 48 Fed.Cl. 124, 136 (2000) (citing 48 C.F.R. § 15.306(e)(1)). Nonetheless, "agencies are not required to conduct identical discussions with each offeror." *Femme Comp,* 83 Fed.Cl. at 735 (citing *WorldTravelService,* 49 Fed.Cl. at 440). Rather, the procuring agency should tailor discussions to each offeror's proposal, *WorldTravelService,* 49 Fed.Cl. at 440, with the scope and extent of discussions resting squarely within the judgment of the contracting officer, 48 C.F.R. § 15.306(d)(3).

### 3. Discussions with DMS and He & I Compared

 The court has described the two rounds of discussions held with the offerors in this procurement, *supra.* In October 2007, DMS was asked during discussions if it meant to omit its figure for RSM data from cost totals and its price coefficient formula. AR at 1145. Also in October 2007, He & I was asked during discussions to provide a greater amount of supporting information to explain its price coefficient, because more specific information was deemed necessary to perform a complete price analysis. AR at 1149. Plaintiff correctly states that He & I was asked to include much more information in its October 2007 proposal revision, but incorrectly concludes that the October 2007 discussions were thus made unequal. Pl.'s Mot. at 29–35. The discussion questions given to DMS and He & I in October 2007 were tailored to aspects of their initial proposals that required either clarification or improvement, and directly reflect the results of the price analysis of these offerors' initial proposals. *See* AR Tab 13. The October 2007 discussions were not unequal and were fair.[20]

The October 2008 discussion letters sent to DMS and He & I are identical in their discussion of revisions to price proposals, and contain no specific comments requesting particular information or improvements. AR at 2118–19, 2121. Thus, the record shows that the October 2008 discussions were not only

---

**20.** The court notes that DMS was awarded the contract on the basis of these discussions and the

October 2007 revised proposals.

equal as to the revision of the offerors' price proposals, they were exactly the same. Plaintiff apparently believes that some lingering aftershock from the October 2007 discussion letter to He & I tainted the October 2008 discussions and spurred He & I into revising its price coefficient. Pl.'s Mot. at 34 (discussing the October 2007 discussion letter and noting the significant reduction of He & I's bid price in January 2009). The record does not support such speculation.

The Army's analysis of He & I's reduced final price noted that He & I had relied upon "five years of actual historical cost figures from 222 actual job order contract projects at Fort Sill" and a new, 2009 edition of the RSM. AR at 2588. The October 2008 discussion letters to DMS and He & I had mentioned the "passage of time" and "updated price information." AR at 2118–19, 2121. He & I (and White Hawk/Todd) had learned that their initial bid prices were higher than DMS's October 2007 bid price. Compl. ¶ 39. All of these facts show that He & I had ample reason to reduce its bid price. The record contains no indication that the Army's request for supporting information for He & I's price coefficient in October 2007 had any connection to He & I's decision to lower its final bid price. Plaintiff has not shown that the October 2008 discussions favored He & I or were unequal. The court finds no violation of FAR 15.306(e) or of FAR 3.101–1 in this procurement.

## CONCLUSION

DMS has failed to demonstrate that defendant's decision to award the contract to He & I was arbitrary or capricious, an abuse of discretion, or otherwise contrary to law. Because DMS's protest has not succeeded on the merits, the court need not proceed to the question of whether DMS has shown that it is entitled to injunctive relief from this court. For the reasons discussed above, plaintiff's cross motion for judgment on the administrative record is denied, and defendant's cross

motion for judgment on the administrative record is granted.

Accordingly, it is hereby **ORDERED** that

(1) Plaintiff's Cross–Motion for Judgment on the Administrative Record, filed November 16, 2009, is **DENIED;**

(2) Defendant's Cross–Motion for Judgment upon the Administrative Record, filed November 16, 2009, is **GRANTED;**

(3) The Clerk's Office is directed to **ENTER** final judgment in favor of defendant and intervenor-defendant, dismissing the complaint with prejudice;

(4) On or before **January 22, 2010,** counsel for the parties shall **CONFER** and **FILE** with the Clerk's Office a **redacted copy** of this opinion, with any material deemed proprietary marked out and enclosed in brackets, so that a copy of the opinion can then be prepared and made available in the public record of this matter; and

(5) Each party shall bear its own costs.