### GOLDEN MANUFACTURING CO., INC., Plaintiff,

v.

### The UNITED STATES, Defendant.

### No. 12–317 C.

United States Court of Federal Claims.

Oct. 1, 2012.[1]

---

**1.** This opinion was issued under seal on August 17, 2012. Pursuant to ¶ 4 of the ordering language, the parties were invited to identify source selection, proprietary or confidential material subject to deletion on the basis that the material was protected/privileged. Brackets ([ ]) identify the redacted portions of this opinion.

Marc Lamer, Philadelphia, PA, for plaintiff.

A. Bondurant Eley, United States Department of Justice, with whom were Stuart F. Delery, Acting Assistant Attorney General, Jeanne E. Davidson, Director, Harold D. Lester, Jr., Assistant Director, Washington, DC, for defendant.

## OPINION AND ORDER

BUSH, Judge.

Plaintiff Golden Manufacturing Co., Inc. (Golden) filed its pre-award bid protest complaint on May 16, 2012. In its complaint, Golden challenges actions of the Defense Logistics Agency Troop Support (DLATS or Agency) as it conducts a procurement for Army combat uniforms based on Solicitation No. SPM1C1–10–R–0025 (Solicitation). In this protest, Golden seeks a permanent injunction and declaratory relief, alleging that the Solicitation was materially changed by a subsequent amendment and, as a consequence, that a new competition must issue for the revised requirements for uniform trousers.

The administrative record (AR) of this procurement was originally filed on May 31, 2012, and corrections to the AR were filed on June 8, 2012, June 22, 2012 and July 12, 2012. Briefing was filed according to an expedited schedule and oral argument was held on July 24, 2012. As discussed below, the Agency's modification of the Solicitation did not violate statutory requirements for full and open competition. Defendant's motion for judgment on the administrative record is therefore granted, and plaintiff's motion for judgment on the administrative record is denied.

## BACKGROUND

### I. The Solicitation

The Solicitation for Army combat uniforms may be viewed as a bundle of six smaller solicitations, pursuant to which DLATS would obtain three lots of coats and three lots of trousers by making six separate contract awards. Three of the awards would be for Lots 0001C, 0002C and 0003C, where "C" indicates coats, and three of the awards would be for Lots 0001T, 0002T and 0003T, where "T" indicates trousers. Plaintiff in this bid protest only contests the trousers portion of the procurement. The Solicitation issued on January 25, 2010.

### A. Lots 0001T, 0002T and 0003T

The Agency wished to procure the combat uniform trousers from multiple offerors, while reserving the right to award multiple lots to a single source if such a course of action were deemed to be in the government's best interest. AR at 2. Of the total number of trousers the Agency was to purchase under the Solicitation, Lot 0001T would comprise 55.52% of the total, Lot 0002T would comprise 28.15% of the total, and Lot 0003T would comprise 16.33% of the total. *Id.* The maximum quantity of trousers to be ordered annually in each lot remains constant in the base year and four option years. *Id.* at 13, 15, 17. The annual maximum order of trousers for Lot 0001T is 764,150, for Lot 0002T the maximum is 387,-500 and for Lot 0003T it is 224,750.[2] *Id.*

Within each lot, three varieties of trousers may be purchased. Although the varieties of trousers share many common characteristics, the fabrics from which the trousers would be made differ. For evaluative purposes, the relative proportion of the three varieties of trousers remains constant in all three lots. AR at 14–18. The varieties of trousers in each lot are the subject of much argument in this bid protest, and for this reason the court discusses those varieties in some detail here.

2. The Solicitation seeks offers for Indefinite Delivery/Indefinite Quantity (ID/IQ) contracts. *See* AR at 176–77, 188. This type of contract permits the Agency to purchase less than the maximum number of trousers specified in the Solicitation.

The fabrics for the trousers, all in a camouflage pattern, are described as being either Type I ("50/50% nylon/cotton ripstop blend") or Type II ("65/25/10 flame resistant rayon/para-aramid/nylon blend"), and as being either untreated with insecticide (Class 1) or treated with the insecticide Permethrin (Class 2). AR at 108–09. There are three varieties of trousers in each lot, with the percentage of each variety indicated for evaluative purposes: Type I, Class 1 (62.5% of each lot); Type II, Class 1 (18.75% of each lot); and, Type II, Class 2 (18.75% of each lot). *Id.* at 14–18; *see also* Pl.'s Mot. at 4. All varieties of trousers are to be constructed according to Pattern Style PD07_14 (October 7, 2009). AR at 44. All varieties of trousers are to be "made in accordance with [Purchase Description] GL/PD 07–14A dated June 10, 2009." *Id.*

## B. Evaluation Procedures and Pertinent Solicitation Terms

The Solicitation permits a two-phase evaluation procedure if numerous offers are received, a condition which indeed occurred. In essence, the Agency could eliminate less-competitive offerors during a first phase screening process:

> During the first phase of this process, all offeror[s'] Product Demonstration Models (PDM) and proposed prices will be evaluated. PDM and pricing are of equal importance during the first phase. Based off of this initial evaluation, only those firms that have submitted the most highly rated PDM's and who have submitted price proposals that are realistic and competitive with other offerors who have submitted highly rated PDM's will be included in the second phase. Offerors not included in the second phase will be promptly notified that their offer has been eliminated from competition and no proposal revisions will be considered.

AR at 188. As this Solicitation section demonstrates, offerors were warned that their product sample (the "PDM") and their proposed price could be determinative of their opportunity to continue on in the competition for the lots of trousers.

The second phase of the evaluation would introduce a third evaluation factor, that of past performance. AR at 188. The Solicitation provides this description of the second phase evaluation and further procedures:

> Those offerors selected for the second phase will then be evaluated for past performance/experience.... These evaluations will then be combined with the first phase evaluations. As outlined ... below, the technical factors when combined are significantly more important than pricing. After the combination of the first and second phase evaluations the contracting officer will determine whether to establish a competitive range so as to enter into discussions or to award without discussions.

*Id.* The Solicitation indicates that the proposals offering the best value to the Agency, not necessarily the lowest-priced offers, would be chosen for award. *Id.* at 189.

Each offeror was required to provide one PDM, or product sample, of the Type I, Class 1 trousers. AR at 4. The product samples would be rated for how well they matched the Purchase Description in terms of visual, dimensional and manufacturing requirements. AR at 189. The adjectival rating options for the product samples are Exceptional, Very Good, Satisfactory, Marginal or Unsatisfactory. *Id.* at 190.

The total evaluated price for each offer for a particular lot of trousers would encompass the base year and the four option years. AR at 193. The total evaluated price is calculated by taking unit prices and multiplying them against the annual evaluative quantities (which in this procurement were the maximum possible amount) of each variety of trousers in a lot over five years. *Id.* An offeror's total price would also be evaluated by comparing the proposed price to other offerors' prices, and by ensuring that the offered price was "fair and reasonable." *Id.*

Finally, the Solicitation contains several statements that put offerors on notice that the awarded contract for each lot might vary from the technical specifications or the evaluative quantities of varieties of trousers noted in the Solicitation. As to technical specifications, the Solicitation states that:

The Government reserves the right to perform conversions to the various combat utility uniforms or any new combat utility uniform with similar patterns and specifications, shall the Government determine a need.

AR at 3. The Solicitation also includes a "Changes" clause. *Id.* at 179. That clause provides that the "Contracting Officer may at any time, by written order, and without notice to the sureties, if any, make changes within the general scope of this contract in ... [d]rawings, designs, or specifications when the supplies to be furnished are to be specially manufactured for the Government in accordance with the drawings, designs, or specifications." 48 C.F.R. § 52.243–1(a) (2011).

As to the quantities to be purchased in each lot, and the relative proportion of the varieties of trousers to be purchased in each lot, the Solicitation warns offerors that:

> Offers will be evaluated based on the Evaluative quantity maximum, which is based on the maximum for each lot spread over the three types of coats or trousers. This is merely for evaluation purposes and the Government reserves the right to order any combination of the items on subject lot.

AR at 3. In the court's view, the Solicitation provides for an evaluation scheme, where, in the first phase, offerors would be screened based on their ability to produce a conforming product sample and their ability to match the most competitive prices under consideration by the Agency. The Solicitation did not promise, however, that the Pattern Style, the Purchase Description, or the relative proportion of the varieties of trousers within each lot would remain constant throughout the procurement process or throughout the five years of potential contract performance.

## II. History of the Procurement

### A. Amendments 0001–0013 and First Phase Evaluations

In Amendments 0001 through 0011, the Agency made several changes to the Solicita-

tion, many of which were changes to or clarifications of the Purchase Description. *See, e.g.,* AR at 195, 198, 204, 207, 209, 213, 216–17, 222, 225. The Agency also extended the deadline for proposals from February 24, 2010 to March 10, 2010. *Id.* at 223. Golden submitted bids for Lots 0001T, 0002T and 0003T, and plaintiff's product sample for these proposals was evaluated on June 8, 2010. *Id.* at 618.

Later, however, the competition for Lots 0001T, 0002T and 0003T was re-opened by Amendments 0012–0013, and price revisions were solicited (but not required) from all offerors. AR at 226, 237. Final price proposals were due on September 23, 2010. *Id.* at 237. [ ] caused Golden to be eliminated from the competition for all three lots of trousers during the first phase evaluation process. The first phase eliminations occurred on April 28, 2011, and Golden was notified of its elimination on May 25, 2011. AR Tabs 6–7.

### B. Amendments 0014–0015 and Changes Affecting Second Phase Contenders

The Agency issued Amendment 0014 to the Solicitation on January 12, 2012. This amendment gave offerors that remained in the competition after the first phase cuts had been made an opportunity to revise their prices once again.[3] AR at 243. The copy of the amendment in the record before the court does not indicate, however, when such price revisions were due. Subsequently, Amendment 0015 (hereinafter Amendment 15) to the Solicitation was issued on April 17, 2012. This amendment again permitted offerors still in contention for award of the lots of trousers a chance to revise their prices. AR at 269. Although the submission date is not in the record, it appears that the price revisions were due on or about May 17, 2012. Compl. ¶ 31.

Amendment 15 went further than simply allowing offerors to update their prices. Changes were made to the evaluative quanti-

---

**3.** Amendments 0014 and 0015 apply to the lots of coats, as well as to the lots of trousers. Because this protest only concerns the trousers portion of this procurement, the court's discussion of these amendments does not address the competition for the lots of coats.

ties in each of the lots of trousers, although the total number of trousers in each lot did not change.[4] *Compare* AR at 13–18 *with id.* at 273–75. In addition, the fabrics for the three varieties of trousers were changed from those specified in the original Solicitation. Now, each lot of trousers would include: (A) Type I, Class 2 trousers; (B) Type III, Class 2 trousers; and, (C) Type III, Class 2 trousers in a particular pattern referred to as Operation Enduring Freedom Camouflage Pattern (OCP).[5] Finally both the Pattern Style and Purchase Description were replaced with updated versions developed by the government, namely Pattern Style PD07_14 (January 30, 2012), Pattern Style PD07_14FR (November 15, 2011), and Purchase Description GL/PD 07–14C (October 4, 2011). AR at 332. Thus, it is clear that by 2012 the Agency's requirements for trousers had changed, and certain of the figures used in the Agency's formula for calculating an offeror's total evaluated price had also changed. The question before the court is whether those changes constitute a cardinal change of the contract work so that a new competition for the trousers is required by law.

## C. Golden's Challenge to the Procurement of the Trousers

On April 24, 2012, Golden wrote DLATS and challenged plaintiff's exclusion from the ongoing competition for trousers, in light of the changes to the Solicitation made by Amendment 15. AR at 693. The letter stated that

> [Golden] ... hereby requests that its proposal on Lots 0001T, 0002T and 0003T (*i.e.,* the Trouser lots) be restored to the competition so that it is permitted to submit a

revised proposal on the Trouser lots.... The basis for this request, as will be explained more fully below, is that the changes (both to the items being procured and the evaluation methodology) implemented by Amendment 0015 are so extensive as to render the original evaluations (which resulted in [Golden's] proposal on the Trouser lots being excluded from the competition) no longer valid evaluations. Indeed, the changes are extensive enough to call into question whether FAR 15.206(e)[, 48 C.F.R. § 15.206(e) (2011),] is triggered, requiring cancellation of the Solicitation.

*Id.* The letter proceeded to detail the changes made by Amendment 15. In conclusion, Golden asserted that

> Amendment 0015 made substantial changes in the garments to be supplied clearly affecting the price of the garments *and* in the mathematical formula for evaluating the offerors' prices. This came more than two (2) years since submission of the original proposals and nearly a year since the original evaluations. Thus, the original evaluations, which resulted in [Golden's] trouser proposal being eliminated from the competition no longer form a valid basis for the source selection decisions.... [W]here an amendment makes changes in requirements that are directly related to the reasons an offeror had been excluded from the competition, the offeror should be permitted to respond.... [Golden] believes the changes included in Amendment 0015, changing both the sewing operations and the materials specified bear a direct relationship to the reasons [Golden's] proposal was excluded from the competitive range,[ [6]] *i.e.,* PDM and price. Therefore,

---

4. In Amendment 15, the annual evaluative quantities for the less expensive trousers (A) and the more expensive flame resistant trousers (B and C) were modified, although the total number of trousers (A + B + C) did not change. For Lot 0001T, A(477,594) + B(143,278) + C(143,278) = 764,150 was changed to A(534,905) + B(152,-830) + C(76,415) = 764,150. *Compare* AR at 13–14 *with id.* at 273. For Lot 0002T, A(242,-188) + B(72,656) + C(72,656) = 387,500 was changed to A(271,250) + B(77,500) + C(38,750) = 387,500. *Compare* AR at 15–16 *with id.* at 274. Finally, for Lot 0003T, A(140,469) + B(42,-140) + C(42,141) = 224,750 was changed to

A(157,325) + B(44,950) + C(22,475) = 224,750. *Compare* AR at 17–18 *with id.* at 275. Thus, Amendment 15's evaluative quantity modifications increased the proportion of the less expensive trousers in each lot, for evaluative purposes.

5. "Type III" fabric is defined as flame resistant ripstop cloth, with unspecified fiber content, that meets certain specifications. *See* AR at 427, 431, 514, 518–19.

6. Golden's reference to a competitive range is technically incorrect. The first phase evaluations screened out less-competitive offerors, but

it should be given the opportunity to submit a revised proposal on the trouser lots in response to Amendment 0015.

*Id.* at 695–96.

In a response sent May 9, 2012, the Agency disagreed with Golden's analysis of Amendment 15. Golden would not be reinstated in the competition for the lots of trousers because

> [t]he changes included in Amendment 0015 are considered within the scope of the solicitation and are not so substantial as to exceed what prospective offerors reasonably could have anticipated. Furthermore, the most significant changes in price as a result of Amendment 0015—adding Permethrin to the [Type I trousers] and changes in the [flame resistant (FR) ] Fabric—are largely uniform across industry as there is little price difference between Permethrin applicators and the price charged by the sole FR fabric supplier. Therefore, the determinations made during the two-phase technical/price evaluation are still valid.

AR at 697. Approximately one week later, Golden filed its bid protest in this court, seeking cancellation of the Solicitation and resolicitation of the trousers requirement. Compl. ¶ 35. In its motion for judgment on the administrative record, plaintiff repeats that request, and, in the alternative, seeks the restoration to the competition of all offerors who were eliminated in the first phase of the Agency's evaluation of proposals for the lots of trousers. Pl.'s Mot. at 21.

## DISCUSSION

### I. Bid Protest Jurisdiction

This court "shall have jurisdiction to render judgment on an action by an interested party objecting to a solicitation by a Federal agency for bids or proposals for a proposed contract or to a proposed award or the award of a contract or any alleged violation of statute or regulation in connection with a procurement or a proposed procurement." 28 U.S.C. § 1491(b)(1) (2006). The jurisdiction-

al grant is "without regard to whether suit is instituted before or after the contract is awarded." *Id.* As a threshold jurisdictional matter, however, the plaintiff in a bid protest must show that it has standing to bring the suit. *Info. Tech. & Applications Corp. v. United States,* 316 F.3d 1312, 1319 (Fed.Cir. 2003) (*ITAC*); *Myers Investigative & Sec. Servs., Inc. v. United States,* 275 F.3d 1366, 1369 (Fed.Cir.2002) (citation omitted).

### II. Standard of Review for Judgment on the Administrative Record

Rule 52.1(c) of the Rules of the United States Court of Federal Claims (RCFC) provides for judgment on the administrative record. To review a motion, or cross-motions, under RCFC 52.1(c), the court asks whether, given all the disputed and undisputed facts, a party has met its burden of proof based on the evidence in the record. *Bannum, Inc. v. United States,* 404 F.3d 1346, 1356–57 (Fed. Cir.2005). The court must make factual findings where necessary. *Id.* The resolution of RCFC 52.1(c) cross-motions is akin to an expedited trial on the paper record. *Id.*

### III. Bid Protest Review

■ The court first examines whether the plaintiff in a bid protest has standing to bring the suit. *ITAC,* 316 F.3d at 1319. Standing arises from prejudice, which is present if the plaintiff establishes that it is an interested party with a direct economic interest in the procurement. *Id.* (citing *Am. Fed'n of Gov't Employees v. United States,* 258 F.3d 1294, 1302 (Fed.Cir.2001) (*AFGE* )). Bid protest standing is limited to those plaintiffs who are " 'actual or prospective bidders or offerors whose direct economic interest would be affected by the award of the contract or by the failure to award the contract.' " *Weeks Marine, Inc. v. United States,* 575 F.3d 1352, 1359 (Fed.Cir.2009) (quoting *AFGE,* 258 F.3d at 1302). In the context of a pre-award bid protest, a plaintiff must establish that it has suffered or will suffer a " 'non-trivial competitive injury

---

did not, pursuant to the terms of the Solicitation, create a competitive range of the remaining offerors. *See* AR at 188.

which can be addressed by judicial relief.' " [7] *Id.* at 1362.

■ As the United States Court of Appeals for the Federal Circuit has stated, "the proper standard to be applied [to the merits of] bid protest cases is provided by 5 U.S.C. § 706(2)(A) [ (2006) ]: a reviewing court shall set aside the agency action if it is 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.' " *Banknote Corp. of Am. v. United States,* 365 F.3d 1345, 1350–51 (Fed.Cir.2004) (citing *Advanced Data Concepts, Inc. v. United States,* 216 F.3d 1054, 1057–58 (Fed.Cir.2000)). Under this standard, a procurement decision may be set aside if it lacked a rational basis or if the agency's decision-making involved a clear and prejudicial violation of statute, regulation or procedure. *Emery Worldwide Airlines, Inc. v. United States,* 264 F.3d 1071, 1085–86 (Fed.Cir.2001) (citing *Impresa Construzioni Geom. Domenico Garufi v. United States,* 238 F.3d 1324, 1332–33 (Fed.Cir.2001)). "The arbitrary and capricious standard applicable [in bid protests] is highly deferential." *Advanced Data Concepts,* 216 F.3d at 1058.

■ *De minimis* errors in the procurement process do not justify relief. *Grumman Data Sys. Corp. v. Dalton,* 88 F.3d 990, 1000 (Fed.Cir.1996) (citing *Andersen Consulting v. United States,* 959 F.2d 929, 932–33, 935 (Fed.Cir.1992)). The bid protest plaintiff bears the burden of proving that a significant error marred the procurement in question. *Id.* (citing *CACI Field Servs., Inc. v. United States,* 854 F.2d 464, 466 (Fed.Cir. 1988)). Examples of arbitrary and capricious agency action include "when the agency 'entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or [the decision] is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.' " *Ala. Aircraft Indus., Inc.-Birmingham v. United States,* 586 F.3d 1372, 1375 (Fed.Cir.2009) (quoting *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.,* 463 U.S. 29, 43, 103 S.Ct. 2856, 77

L.Ed.2d 443 (1983)) (alteration in original). The court will, however, "uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned." *Bowman Transp., Inc. v. Arkansas–Best Freight Sys., Inc.,* 419 U.S. 281, 286, 95 S.Ct. 438, 42 L.Ed.2d 447 (1974) (citation omitted).

" 'If the court finds a reasonable basis for the agency's action, the court should stay its hand even though it might, as an original proposition, have reached a different conclusion as to the proper administration and application of the procurement regulations.' " *Honeywell, Inc. v. United States,* 870 F.2d 644, 648 (Fed.Cir.1989) (quoting *M. Steinthal & Co. v. Seamans,* 455 F.2d 1289, 1301 (D.C.Cir.1971)). If, on the other hand, "the trial court determines [that] the government acted without rational basis or contrary to law when evaluating the bids and awarding the contract[,] … it proceeds to determine, as a factual matter, if the bid protester was prejudiced by that conduct." *Bannum,* 404 F.3d at 1351. Plaintiff again bears the burden of proof. *Id.* at 1358. "Prejudice is a question of fact." *Id.* at 1353 (citing *Advanced Data Concepts,* 216 F.3d at 1057).

## IV. Standing

### A. Whether the Non–Trivial Competitive Injury Test Applies in These Circumstances

■ Defendant argues that the "non-trivial competitive injury" test for pre-award bid protest standing identified in *Weeks Marine* should not be the measure of prejudice in a pre-award protest where, as here, the protestor has submitted a bid. Def.'s Mot. at 10 & n. 6 (relying on *CS–360, LLC v. United States,* 94 Fed.Cl. 488, 495 n. 6 (2010)). There is some support for defendant's position. To resolve this question, a review of *Weeks Marine* and cases declining to apply the standing test identified in *Weeks Marine* to a subset of pre-award bid protests is required.

The protestor in *Weeks Marine* challenged a decision by the Army Corps of Engineers

---

7. Defendant argues that the pre-award standing test identified in *Weeks Marine* should not apply in a pre-award protest where the protestor has submitted a bid. This argument will be addressed in the next section of this opinion.

(Corps) to change its method of procuring contracts for dredging projects:

> The [challenged] solicitation represents a significant departure from current Corps practice. First, the solicitation employs a negotiated, rather than sealed bidding, format. Second, pursuant to the solicitation, multiple contractors will be awarded indefinite duration indefinite quantity multiple-award task order contracts .... It is envisioned that, thereafter, an unknown number ("indefinite quantity") of task orders will be issued under each of the contracts. [The] contractors will submit bids and will compete with each other for task orders as they arise. Through the solicitation, the Corps is seeking to cover all dredging projects within the South Atlantic Division over the next five years.

575 F.3d at 1355. The Federal Circuit then discussed whether the demonstration of the protestor's "substantial chance" of receiving the contract award but for the alleged agency error, the traditional test for standing in bid protests and the test proposed by the government in *Weeks Marine,* is the proper standard for pre-award bid protests:

> We have not had occasion to discuss what is required to prove an economic interest, and thus prejudice, in a case such as this, where a prospective bidder/offeror is challenging a solicitation in the pre-award context. In such a case, it is difficult for a prospective bidder/offeror to make the showing of prejudice that we have required in post-award bid protest cases. *See, e.g., Statistica,* 102 F.3d at 1582 (holding that a contractor lacked standing because it failed to show a "substantial chance it would have received the contract award but for" agency error). The reason of course is that, in a case such as this, there have been neither bids/offers, nor a contract award. Hence, there is no factual foundation for a "but for" prejudice analysis.

*Id.* at 1361 (citing *Statistica, Inc. v. Christopher,* 102 F.3d 1577, 1582 (Fed.Cir.1996)). The Federal Circuit concluded that rather than requiring the pre-award protestor to show that it had a "substantial chance" of contract award but for the agency error, a different standard should apply:

> [W]e conclude that in a pre-award protest such as the one before us, [a] prospective bidder or offeror must establish "a non-trivial competitive injury which can be redressed by judicial relief" to meet the standing requirement of § 1491(b)(1).

*Id.* at 1363.

The "non-trivial competitive injury" test thus became the new, precedential standing test for pre-award bid protests brought before this court. *See, e.g., Orion Tech., Inc. v. United States,* 102 Fed.Cl. 218, 227 (2011) ("In most preaward bid protests decided after *Weeks Marine, Inc.* where standing was at issue, the court has analyzed a protester's direct economic interest under the *Weeks Marine, Inc.* test."). However, some opinions issued by this court have considered that the "substantial chance" test, not the "non-trivial competitive injury" test, should apply where bids have been received in a procurement that is challenged by a pre-award protest. *See, e.g., CS–360,* 94 Fed.Cl. at 495 n. 6 ("The traditional 'substantial chance' test, therefore, seems more appropriate given the facts of this [pre-award bid protest]."); *DMS All–Star Joint Venture v. United States,* 90 Fed.Cl. 653, 661 & n. 10 (2010) (applying the "substantial chance" test in a pre-award bid protest because the protestor challenged not the terms of the solicitation but the proposed award to a particular offeror); *Med. Dev. Int'l, Inc. v. United States,* 89 Fed.Cl. 691, 701 (2009) (*Medical Development* ) ("The court finds that because this post-competitive range challenge to the competitive range determination is sufficiently analogous to a post-award challenge to award, the 'substantial chance' test is the appropriate standard under which to evaluate [prejudice in] plaintiff's [pre-award bid protest]."). Subsequent pre-award bid protest opinions have noted that the "substantial chance" test for prejudice has been applied in some pre-award bid protests where bids have been received from the offerors, but, for a variety of reasons, these opinions have not stated that the "substantial chance" test was the correct test for standing in the case *sub judice. See, e.g., Orion,* 102 Fed.Cl. at 227–28 (noting the lack of uniformity in this court's application of the *Weeks Marine* standing test, but declining to

choose between the competing tests for standing because the pre-award protestor in *Orion* lacked standing under either the "substantial chance" test or the "non-trivial competitive injury" test); *ICP Northwest, LLC v. United States,* 98 Fed.Cl. 29, 36 (2011) (citing *CS–360* as an example of the "substantial chance" test being applied in pre-award protests where bids had been submitted, but applying the "non-trivial competitive injury" test instead); *Magnum Opus Techs., Inc. v. United States,* 94 Fed.Cl. 512, 531 n. 13 (2010) (distinguishing *Medical Development* and *DMS All–Star* as cases in which bids had been submitted by the protestors, whereas in *Magnum Opus* the protestors challenged an agency decision to not procure certain services, and concluding that the "non-trivial competitive injury" standing test was appropriate in that pre-award bid protest). The court concludes that there is some room for debate as to whether the "non-trivial competitive injury" test should apply in pre-award protests where bids have been received by the procuring agency.

Although defendant has not challenged Golden's standing to bring this bid protest, standing is a threshold inquiry that the court must address. *ITAC,* 316 F.3d at 1319. The court notes, first, that this case is unlike *DMS All–Star,* a protest where all of the challenges to the proposed award decision were focused on alleged errors made in proposal evaluations and in conducting discussions with the offerors. *See* 90 Fed.Cl. at 660. In *DMS All–Star,* all the facts required to demonstrate the protestor's "substantial chance" of receiving the contract award, but for the agency's alleged errors, were available in the record. *See id.* at 662 (noting that the comparative ratings of the contenders for award showed that the protestor had a substantial chance of award, if the protestor won on the merits of its protest).

Here, however, Golden asserts that the entire evaluation process of proposals was rendered invalid by an out-of-scope amendment to the Solicitation, and that a new

solicitation for the Agency's changed trousers requirement should have issued. The inquiry to determine Golden's standing to bring such a protest asks whether Golden would be a prospective bidder on a new solicitation for the trousers and whether Golden would have a direct economic interest in the new procurement. No bids for such a procurement are in the record, and little factual basis exists for determining Golden's "substantial chance" of award under a new solicitation. Like the protestor in *Weeks Marine,* Golden seeks a change in the procurement vehicle chosen by the government, and the "but for" world that would follow the issuance of a new solicitation is not documented in the administrative record. For this reason, the court believes that the "non-trivial competitive injury" test for standing must be employed in this case, despite the fact that Golden submitted a bid in response to the original Solicitation and its bid was evaluated by DLATS on two of the three evaluation criteria.

**B. The Agency's Alleged Error in Refusing to Resolicit the Trousers Requirement Would Be a Non–Trivial Competitive Injury**

■ It is clear that Golden would be a prospective bidder on a new solicitation for the trousers requirement. First, Golden was an actual bidder in this procurement and [ ] under the original Solicitation. Second, Golden contacted DLATS after Amendment 15 issued and requested that it be allowed to re-enter the competition.[8] Third, Golden filed this protest demanding that the Agency cancel the Solicitation and issue a new solicitation for the changed trousers requirement. Thus, for purposes of this bid protest, Golden has shown that it would be a prospective bidder on a new procurement.

As to Golden's non-trivial competitive injury, this is a closer question. It is clear that [ ]. Golden also has a history of successfully competing for contracts with the Agency for uniform coats. AR at 590–612. [ ], the court

8. Early in this bid protest, plaintiff indicated that Golden would submit a revised price proposal in response to Amendment 15, even though the Agency rejected its request to do so. Compl. ¶ 34. It is unclear whether Golden did indeed submit a revised price proposal. In any event, plaintiff's standing is established by its prospective bidder status, whether or not it has provided the Agency with a revised price proposal in response to Amendment 15.

cannot conclude that Golden's loss of an opportunity to respond to a new solicitation is only a trivial competitive injury.[9]  *See, e.g., Night Vision Corp. v. United States,* 68 Fed. Cl. 368, 392 (2005) ("This initial evaluation of the administrative record [to identify prejudice to the protestor] is only to determine if there are sufficient facts in the record to establish standing—it does not include weighing facts and making substantive determinations on the merits.") (citation omitted). The court concludes that if, indeed, Amendment 15 was a cardinal change to the trousers requirement, Golden suffered a non-trivial competitive injury when the Agency failed to issue a new solicitation.  Thus, Golden has standing to bring its protest before this court.

## V. The Cardinal Change Doctrine in the Bid Protest Context

### A. Caselaw

■ The cardinal change doctrine was developed to discern whether modifications to a government contract were severe enough to constitute a breach of contract by the government.  *See, e.g., Allied Materials & Equip. Co. v. United States,* 569 F.2d 562, 563–64 (Ct.Cl.1978) (citations omitted).  A cardinal change "occurs when the government effects an alteration in the work so drastic that it effectively requires the contractor to perform duties materially different from those originally bargained for."  *Id.* Another influential definition of the cardinal change doctrine states that:

> The basic standard, as the court has put it, is whether the modified job was essentially the same work as the parties bargained for when the contract was awarded.  Plaintiff has no right to complain if the project it ultimately constructed was essentially the same as the one it contracted to construct.  Conversely, there is a cardinal change if the ordered deviations altered the nature of the thing to be constructed.  Our opinions have cautioned that the problem is a

matter of degree varying from one contract to another and can be resolved only by considering the totality of the change and this requires recourse to its magnitude as well as its quality.  There is no exact formula. . . . Each case must be analyzed on its own facts and in light of its own circumstances, giving just consideration to the magnitude and quality of the changes ordered and their cumulative effect upon the project as a whole.  In emphasizing that there is no mechanical or arithmetical answer, we have repeated that (t)he number of changes is not, in and of itself, the test[.]

*Air–A–Plane Corp. v. United States,* 408 F.2d 1030, 1033 (Ct.Cl.1969) (internal quotations and citations omitted).

The cardinal change doctrine has found use in the bid protest context, as well.  In *AT & T Communications, Inc. v. Wiltel, Inc.,* 1 F.3d 1201 (Fed.Cir.1993) (*AT & T*), the court explained how the cardinal change doctrine should be applied when reviewing contract modifications to ensure that competition requirements are met by a procuring agency:

> This [bid protest] does not ask whether Government modifications breached a contract, but asks instead whether Government modifications changed the contract enough to circumvent the statutory requirement of competition.  The cardinal change doctrine asks whether a modification exceeds the scope of the contract's changes clause; this case asks whether the modification is within the scope of the competition conducted to achieve the original contract.  In application, these questions overlap.  A modification generally falls within the scope of the original procurement if potential bidders would have expected it to fall within the contract's changes clause.

*Id.* at 1205 (citations omitted).

■ Perhaps the most common factual scenario that implicates the cardinal change

9. If the court were required to apply the "substantial chance" test here, the court might find that Golden did not have a substantial chance of contract award when responding to a new solicitation, and that Golden lacked standing to bring this suit.  The highly speculative nature of such an inquiry, however, only confirms the court's view that the "non-trivial competitive injury" test is appropriate in a pre-award protest of this nature.

doctrine in bid protests occurs when a disappointed bidder learns of changes in the awardee's contract, and then attempts to invalidate the contract award on the grounds that the changed contract is not that which was competed by the agency. *See, e.g., AT & T,* 1 F.3d at 1202–03 (services added to awardee's contract trigger protest by disappointed bidders alleging that contract modifications are out of the scope of the original competitive procurement); *CWT/Alexander Travel, Ltd. v. United States,* 78 Fed.Cl. 486, 493–94 (2007) (delays in award and start dates of contract, as well as price increases, alleged to constitute a cardinal change to the contract). Nevertheless, the basic analytical framework of the cardinal change doctrine is the same whenever a protestor alleges that competition has been frustrated by modifications to a contract or solicitation, *i.e.,* that the procuring agency has impermissibly strayed from the scope of the contract requirements that were advertised to offerors. Thus, a protest that a task order or delivery order exceeds the scope of an underlying Indefinite Delivery/Indefinite Quantity (ID/IQ) contract implicates the cardinal change doctrine. *See, e.g., Cal. Indus. Facilities Res., Inc. v. United States,* 104 Fed.Cl. 589, 595–96 (2012) (applying *AT & T* in a protest alleging that a proposed delivery order exceeded the scope of an ID/IQ contract); *Bayfirst Solutions, LLC v. United States,* 104 Fed.Cl. 493, 503–04 (2012) (applying *AT & T* in a protest alleging that a task order exceeded the scope of an ID/IQ contract); *Solute Consulting v. United States,* 103 Fed.Cl. 783, 792–93 (2012) (noting that the analysis in *AT & T* applies to a protest that a task order exceeds the scope of an ID/IQ contract). Similarly, the cardinal change doctrine has been applied in the pre-award protest context, where an offeror or potential offeror asserts that the government has impermissibly modified contract requirements during the procurement process, so that procurement law requires either re-solicitation or some other change to the range of offerors remaining under consideration. *See, e.g., Univ. of New Orleans,* B–184194, 76–1 CPD ¶ 22, 1976 WL 8955 (Comp.Gen. Jan. 14, 1976). Regardless of the procurement scenario, the inquiry is fundamentally the same—"whether Government modifications changed the contract [requirements] enough to circumvent the statutory requirement of competition." *AT & T,* 1 F.3d at 1205.

## B. Statutory and Regulatory Framework

■ The Competition in Contracting Act (CICA) requires executive agencies, when procuring property or services, to "obtain full and open competition through the use of competitive procedures," unless certain specified exceptions apply. 41 U.S.C.A. § 3301(a)(1) (West 2011). It is this statutory imperative for full and open competition that is violated if a procuring agency makes a cardinal change to a contract requirement after accepting bids in response to a solicitation. *See AT & T,* 1 F.3d at 1205 ("[M]odifications outside the scope of the original competed contract fall under the statutory competition requirement."). In other words, a cardinal change to a proposed contract during the course of a procurement, or after the contract has been awarded, disguises the essential nature of the competed contract and frustrates full and open competition.

This principle is carried forth in the Federal Acquisition Regulation (FAR). FAR 15.206(e) provides:

> If, in the judgment of the contracting officer, based on market research or otherwise, an amendment proposed for issuance after offers have been received is so substantial as to exceed what prospective offerors reasonably could have anticipated, so that additional sources likely would have submitted offers had the substance of the amendment been known to them, the contracting officer shall cancel the original solicitation and issue a new one, regardless of the stage of the acquisition.

48 C.F.R. § 15.206(e) (2011). A cardinal change to a solicitation may thus constitute a violation of CICA and a violation of FAR 15.206(e), unless the agency takes steps to re-open the competition and disclose its changed contract requirements to potential offerors.

## C. Whether Changes to a Solicitation Alter the Nature of a Requirement That Was Determinative As To the Evaluation and Elimination of Offerors

The cardinal change doctrine, as applied in the bid protest context, sometimes raises a distinct but related question: Has the agency substantially changed a solicitation or contract requirement that was previously determinative of the elimination of offerors, thus rendering that elimination process arbitrary and capricious? Sometimes this question as to the rationality of an evaluation process that eliminated offerors before a solicitation or contract was changed has been framed as a matter of fundamental fairness. *See, e.g., Avtron Mfg., Inc.,* B–229972, 88–1 CPD ¶ 458, 1988 WL 222812, at *3 (Comp.Gen. May 16, 1988) ("We think it entirely unfair to firms that lose a contract competition because an agency proscribes a conventional, suggested performance approach for the agency to decide, after award, that the same approach is precisely the one needed and then modify the contract accordingly."). In other cases, the changes to the contract or solicitation are seen as invalidating the evaluation process that eliminated offerors before those changes were made, because the evaluation results are no longer trustworthy in light of the agency's revised contract requirements. *See, e.g., Marvin J. Perry & Assocs.,* B–277684, B–277685, 97–2 CPD ¶ 128, 1997 WL 687158, at *3 (Comp.Gen. Nov. 4, 1997) ("[T]he record does evidence that if quotes had been obtained from the . . . vendors on the basis of ash rather than red oak furniture, prices may have been significantly lower than the award prices, and that a different vendor may well have been selected.") (citation omitted). Finally, another way to consider the impact of solicitation or contract changes on the rationality of an evaluation process that eliminated a protestor is to frame such an inquiry as a determination of prejudice to the protestor. *See, e.g., MVM, Inc. v. United States,* 46 Fed.Cl. 126, 132 (2000) (first finding a cardinal change in a solicitation amendment, then considering whether the agency's evaluation of the winning bid was reasonable to determine whether the protestor was prejudiced by the cardinal change).

These analytical approaches all have value, depending on the particular context of the procurement examined in a bid protest. Here, an important question is whether Amendment 15 rendered Golden's elimination from this competition arbitrary and capricious. This inquiry goes hand in hand with the assertion that Amendment 15 effected a cardinal change of the Solicitation. For this reason, the court will address both questions as it examines the changes to the Solicitation that resulted from the issuance of Amendment 15.[10]

## VI. Analysis of the Merits of Golden's Protest

Amendment 15 caused four principal types of changes to the trousers requirement advertised in the Solicitation. The first is the replacement of the Purchase Description and Pattern Styles with updated versions, as these affect the sewing and manufacture of the trousers. The record shows that these sewing changes were not significant changes that would modify offerors' prices. *See* AR at 695 (letter from Golden acknowledging that the sewing and manufacturing changes do not have "a significant cost impact associated with them"); *id.* at 707; Def.'s Mot. at 5–6 & n. 2. Nor has plaintiff argued that these sewing changes would have an appreciable impact on the product samples submitted to the Agency. Indeed, plaintiff has largely ignored these changes in its arguments alleging that a cardinal change was

---

10. The parties have not directly debated whether Amendment 15 rendered the first phase evaluations in this procurement arbitrary and capricious, but this question has been implicated by many of the factual assertions presented by counsel. *See, e.g.,* Def.'s Reply at 2 (alleging that "the changes effected by Amendment 0015 were not substantial . . . [ ]"); Pl.'s Reply at 8–9 (stating that "[i]t cannot be assumed that all the offerors would . . . []" if they had bid on the trousers requirements set forth in Amendment 15). These factual assertions address the validity of the first phase evaluation process. As a consequence, the court will examine this issue even though plaintiff has not explicitly brought an arbitrary and capricious challenge to the first phase evaluations as a separate and distinct bid protest ground.

effected by Amendment 15. The court finds that the sewing and manufacturing changes encompassed in the updated Purchase Description and Pattern Styles were within the scope of the Solicitation, and do not constitute a cardinal change to the contract requirement. The court also finds that the sewing changes had no impact on the validity of the first phase evaluations of the offerors' PDMs or price proposals.

The second principal change in Amendment 15 is the addition of Permethrin to all varieties of trousers to be purchased in each lot (Type I, Class 2; Type III, Class 2; Type III OCP, Class 2), as opposed to the addition of Permethrin to just one variety of trousers (Type II, Class 2) in the Solicitation dated January 25, 2010. Plaintiff has conceded that the minor price difference occasioned by this change would affect all offerors equally, and that this change was not beyond the Agency's contract right to perform conversions to the trousers it would order through this Solicitation. Oral Argument Recording at 2:39–2:40 PM. It is undisputed that there is only one supplier for Permethrin and that the addition of Permethrin is a fixed, and relatively minor, cost that would affect all offerors equally. *See* Def.'s Reply at 7 n.1 (stating that Permethrin treatment costs [ ] ).

Given the small magnitude of this change, the court finds that the addition of Permethrin to two additional varieties of trousers in each lot was not a cardinal change. The offerors would expect the Changes clause in the Solicitation to encompass such changes. Because the addition of Permethrin would cause no change in the field of offerors who would have responded to the Solicitation had they known of this requirement, this change was not a cardinal change to the contract.

The court agrees with both plaintiff and defendant that the added Permethrin affected all offerors equally, and concludes that this change would not change the relative competitiveness of the [ ] proposals evaluated in the first phase evaluation. Further, plaintiff has not alleged, and the court cannot infer, that the offerors' product samples would, in any way, be affected by the change from Type I, Class 1 fabric (without Permethrin) to Type I, Class 2 fabric (with Permethrin). Thus, the additional Permethrin requirement had no effect on the validity of the first phase evaluation process which eliminated Golden and others from the competition.

The final two principal changes in Amendment 15 require a more detailed examination and comparison to analogous cases. The third principal change was the change from Type II fabric to Type III fabric for the flame resistant trousers to be purchased in each lot. The fourth principal change was the change in the evaluative quantities of the varieties of trousers to be purchased in each lot. The court addresses these changes in turn.

### A. Type III Fabrics Required by Amendment 15

At the heart of plaintiff's protest is Golden's contention that the revised requirements for flame resistant trousers in Amendment 15 constituted a cardinal change to the Solicitation. This view is not supported by the record or by analogous cases. As defendant argues and plaintiff has not refuted, Type III is merely an "updated version" of the Type II flame resistant fabric, and is produced by the same vendor, "Tencate," the sole supplier of these products. Def.'s Mot. at 5 (citing AR at 697, 708); *see also* AR at 524 (noting that the approved Type III fabric is "Improved Defender™ M"); *id.* at 710 (referencing the transition from "Current Defender M" to "Improved Durability Defender M" fabrics); *id.* at 716 (identifying Tencate as the supplier of Type II fabric). Defendant further alleges that Tencate charges each potential contractor essentially the same price for its Type II fabric, and similarly charges each contractor essentially the same price for Type III fabric. Def.'s Mot. at 5; *see also* AR at 697. This assertion is also unrefuted by plaintiff.

An offeror responding to the Solicitation would have anticipated that DLATS would update the flame resistant fabric specifications as an improved flame resistant fabric became available. This specialized fabric, after all, is used in combat uniforms to protect American troops in hazardous conditions. The Solicitation reserved the right of the

Agency to make "conversions" to the trousers, and also included a "Changes" clause. AR at 3, 179. The lots of trousers, after Amendment 15, continue to require a large amount of Type I trousers, and smaller amounts of flame resistant trousers. Amendment 15 is not a cardinal change, because the Agency has merely required updates to the fabrics used in the manufacture of the varieties of the trousers. The essential nature of the procurement has not changed. *See, e.g., AT & T,* 1 F.3d at 1206 (concluding that a contract modification requiring "the next generation of [a particular type of telecommunication] services ... at a higher rate of speed" was within the scope of the solicitation, in part because offerors knew that technological improvements were contemplated by the terms of the solicitation).

As to the price increases caused by the change from Type II to Type III fabrics, uniform pricing of flame resistant fabrics from a sole supplier will logically produce uniform price increases in each offeror's unit price for the flame resistant trousers. In other words, when an upgrade to a more expensive fabric is required, each offeror's price will be inflated by the same amount per unit. Indeed, defendant has provided detailed charts identifying the uniform price increase per unit for Amendment 15's changes to the flame resistant trousers, which plaintiff has not rebutted.

For the change from Type II, Class 1 fabric to Type III, Class 2 fabric for one variety of flame resistant trousers, the government estimates that each vendor would experience a uniform increase in unit price of [ ]. Def.'s Reply at 7 n. 1. For the change from the Type II, Class 2 fabric to Type III OCP, Class 2 fabric for the other flame resistant trousers, the government estimates that each vendor would experience a uniform increase in unit price of [ ]. *Id.* These figures are supported by estimates documented in the record. AR at 707–14. Plaintiff has not argued that defendant's estimates are incorrect, merely that they are unexplained, Pl.'s Reply at 7–8, or misleading, *id.* at 8–9. The

court finds, however, that the figures are adequately explained, and that their meaning is clear.

The record supports defendant's argument that all offerors' prices will increase by a uniform amount per unit, and that the figures provided by defendant are the most accurate estimates of those increases. It is true that the changes in Amendment 15 will make the three contracts awarded for combat uniform trousers more expensive.[11] According to the court's calculation, the increase for the lowest priced offeror for Lot 0001T is [ ]. AR at 621; Def.'s Mot. Ex. A at 4. The increase for Golden for Lot 0001T is [ ]. AR at 621; Def.'s Mot. Ex. A at 4. The increase for the lowest price offeror for Lot 0002T is [ ], and for Golden it is [ ]. AR at 642; Def.'s Mot. Ex. A at 4. The increase for the lowest price offeror for Lot 0003T is [ ], and for Golden it is [ ]. AR at 666; Def.'s Mot. Ex. A at 4. The court finds that these price increases do not constitute a cardinal change in the procurement for trousers. It is not reasonable to presume that a different field of offerors would have responded to the Solicitation if the modest price increases inherent in Amendment 15 had been disclosed on January 25, 2010.

In analogous bid protests, contract modifications which slightly increase price proposals are not considered to be cardinal changes to the contract. In *AT & T,* for example, an increase of $100 million dollars caused by a contract modification was an increase to the total estimated cost of the contract of less than 2 percent, and was not judged to be a cardinal change of contract requirements. 1 F.3d at 1204, 1208. On the other hand, in circumstances where fundamental changes were made to contract requirements, and these changes were accompanied by large price changes, the government's contract modifications have been deemed to be cardinal changes. *See, e.g., Cardinal Maint. Serv., Inc. v. United States,* 63 Fed.Cl. 98, 109 (2004) ("Where, as here, the amount of additional work nearly doubles the price of the contract that was awarded, and the na-

---

**11.** Defendant's revised price proposals take into account the added Permethrin treatment, the fabric changes from Type II cloth to two kinds of Type III cloth, and the revised estimated quantities of the varieties of trousers within each lot. Def.'s Mot. Ex. A.

ture of the work was so substantially increased that the change provision of the contract had to be deleted to accomplish the modifications, the originally awarded contract has been materially changed."); *Poly–Pacific Techs., Inc.,* B–296029, 2005 CPD ¶ 105, 2005 WL 1299551, at *4 (Comp.Gen. June 1, 2005) (finding a cardinal change where the contract requirements were relaxed and the modified services decreased in cost by "as much as 50 percent"); *Webcraft Packaging, Div. of Beatrice Foods Co.,* B–194087, 79–2 CPD ¶ 120, 1979 WL 12167, at *6 (Comp.Gen. Aug. 14, 1979) (finding a cardinal change where the contract's paper requirements were changed from a specialty paper to a more generally available paper, and the contractor proposed a price increase of thirty-seven percent). Although "courts must look beyond simple arithmetic when assessing a cardinal change claim," *PCL Constr. Servs., Inc. v. United States,* 47 Fed. Cl. 745, 806 (2000) (citation omitted), the magnitude of the price increase caused by Amendment 15, between approximately [ ], does not indicate that a cardinal change occurred in this procurement for combat uniform trousers.

As to the validity of the first phase evaluation of price proposals, Amendment 15 has not been shown to have affected, in any significant way, the competitiveness of the prices of the offerors that were being evaluated. As defendant's detailed chart of revised prices shows, none of the offerors would have achieved a different result in the first phase evaluation if they had been bidding on the Amendment 15 requirements: [ ].[12] The court concludes that Amendment 15 did not render the eliminations of the first phase evaluation process invalid.

Plaintiff's principal argument to the contrary is that "[i]t cannot be assumed that all the offerors would take that figure [of the uniform increase in the unit price of each variety of trouser] and simply apply the same indirect rates and profit margins as in their original offers." Pl.'s Reply at 8–9. At oral argument, plaintiff elaborated on this argument and suggested that business decisions might be made by each offeror in response to the changes in Amendment 15, and that these business decisions might produce revised price proposals that differ from those calculated by defendant. Oral Argument Recording at 2:07 PM. The court acknowledges that any such business decisions of offerors responding to the changed contract requirements in Amendment 15 are not presented in the record before the court.

Defendant, however, has provided detailed estimates of revised price proposals based on all of the significant price increases caused by Amendment 15. These estimates appear to the court to be reliable and supported by documents in the record. Plaintiff has not provided any countering evidence showing how the business decisions of offerors might have altered these estimates and invalidated the first phase evaluations of proposals.[13] *See Murray–Benjamin Elec. Co., L.P.,* B–400255, 2008 CPD ¶ 155, 2008 WL 3311846, at *2–*3 (Comp.Gen. Aug. 7, 2008) (denying a protest because the protestor had failed to quantify the impact of changes to the solicitation's requirements, and had thus failed to refute the government's revised price analysis that showed that the protestor's bid would still be the higher-priced offer). In the bid protest context, plaintiff bears the burden of showing a significant error by the procuring agency. *Grumman Data,* 88 F.3d at 1000. Plaintiff has not met that burden here.

### B. Change in Evaluative Quantities

Plaintiff appears to argue that the changes to the evaluative quantities of the varieties of trousers within each lot are significant. Pl.'s Mot. at 20. Plaintiff offers no reason, however, why these changes in Amendment 15 would have changed the field of competitors responding to the Solicitation, or that offerors would not have expected that the Agency might alter its evaluation formula. The evaluative quantities, after all, merely provide

---

**12.** [ ].

**13.** Furthermore, as defendant points out, plaintiff has not shown how Golden would have [ ], strictly in response to Amendment 15's changes, so as to have avoided elimination in a first phase evaluation of proposals for any of the lots of trousers. Def.'s Reply at 9.

the multiplier which the Agency would use for the unit price of each variety of trousers in each lot, to compare the offerors' price proposals. *See supra* note 4. There is no indication in the record that different offerors would have competed for the lots of trousers, or that their price proposals would have been restructured in response to the changes in the evaluative quantities of the varieties of trousers announced in Amendment 15.[14] The court finds that the change in evaluative quantities is not a cardinal change.

Defendant's detailed chart of revised price proposals takes these changes into account and conclusively shows that the first phase elimination of offerors was unaffected by the change in evaluative quantities. Def.'s Mot. Ex. A at 4. Thus, even though the revised evaluative quantities, along with the price increases from the fabric changes, would have produced a new set of evaluated prices from the offerors, these revised prices would not fundamentally change the competitive ranking of the offerors' proposals. *See supra* notes 11–12 and accompanying text. Plaintiff has offered no evidence to show that the revised evaluative quantities rendered the first phase evaluations invalid. The court concludes that the revised evaluative quantities in Amendment 15 did not render the first phase evaluations arbitrary or capricious.

### C. The Cumulative Impact of All Changes in Amendment 15 Is Not a Cardinal Change to the Solicitation

The court has considered all of the changes in Amendment 15 that were noted by plaintiff, Pl.'s Mot. at 20, and finds that Amendment 15 was not a cardinal change to the Solicitation. Neither CICA nor FAR 15.206(e) was violated by the issuance of Amendment 15 and DLATS's decision to proceed with the second phase evaluation of the remaining offerors. The court also finds that the Agency's first phase evaluation of proposals was not rendered invalid by the issuance

of Amendment 15. Because plaintiff has not succeeded on the merits of its protest, the court need not consider whether Golden was prejudiced by the Agency's decision to proceed with the second phase evaluation of remaining offerors after issuing Amendment 15, or whether the standard for injunctive relief has been met in this case.

### CONCLUSION

Accordingly, it is hereby **ORDERED** that

(1) Plaintiff's Motion for Judgment on the Administrative Record, filed June 14, 2012, is **DENIED;**

(2) Defendant's Motion for Judgment on the Administrative Record, filed June 29, 2012, is **GRANTED;**

(3) The Clerk's Office is directed to **ENTER** final judgment in favor of defendant, dismissing the complaint with prejudice;

(4) On or before **September 7, 2012,** counsel for the parties shall **CONFER** and **FILE** with the Clerk's Office a **redacted copy** of this opinion, with any material deemed proprietary marked out and enclosed in brackets, so that a copy of the opinion can then be prepared and made available in the public record of this matter; and

(5) Each party shall bear its own costs.

---

14. Some offerors [ ]. *See* AR at 622, 644, 668. [ ]. *See id.* Amendment 15 made no changes to the total number of trousers in each lot, and there is no reason to presume that changes to the evaluative quantities of the varieties of trousers within each lot would produce changes to the unit prices of the varieties of trousers within a lot. Interestingly, [ ]. *See* AR at 621, 642, 666 (showing [ ]).